CHARIOT HOLDINGS, LTD., *et al.*, Plaintiffs, v. EASTMET CORPORATION *et al.*, Defendants (Michael E. Heisley *et al.*, Counterplaintiffs-Appellees; Zalk Josephs Fabricators, Inc., *et al.*, Counterdefendants-Appellants).

First District (1st Division)   No. 86—1235

Opinion filed February 23, 1987.

52

Richard L. Fenton and Roger K. Heidenreich, both of Sonnenschein, Carlin, Nath & Rosenthal, of Chicago, for appellant.

Bruce S. Sperling, Mitchell H. Macknin, and Jerry M. Santangelo, all of Sperling, Slater & Spitz, of Chicago, for appellees.

JUSTICE O'CONNOR delivered the opinion of the court:

This is an appeal from a purchaser's action for partial specific performance of an asset purchase and sale agreement. After a bench trial, the court found for the purchaser and awarded partial specific performance. On appeal, the sellers argue that the trial court erred: (1) in holding that time was not of the essence; (2) in holding that sellers breached the covenant of good faith and fair dealing; (3) in proceeding to trial and judgment in the absence of a necessary party; (4) by awarding partial specific performance; and (5) by failing to adjust certain notes to be paid by Heisley to Zalk Josephs. We affirm.

On November 1, 1985, Michael E. Heisley and a company he controls, UIP, Inc. (jointly Heisley), entered into a written agreement whereby Heisley was to acquire certain assets from four separate corporations for about $12 million in cash, plus notes and the assumption of $6.3 million in liabilities. The sellers were Eastmet Corporation and three of Eastmet's subsidiary corporations, Harry Davies Molding Company (Harry Davies), UIP Engineered Products Corporation (UIPE), and Zalk Josephs Fabricators, Inc. (Zalk Josephs).[1]

Heisley's action to enforce the agreement was filed as a counterclaim. In the initial action, Heisley and the sellers were named as defendants in an action brought by a third party, Chariot Holdings, Inc., a company controlled by Richard Gray. Gray alleged that prior to entering into the agreement with Heisley, each of the sellers had promised to sell their businesses to him. Gray sued to enforce that alleged promise, sued Heisley for tortious interference with contract, and filed *lis pendens* against the assets in issue here. Gray's claims of breach of promise and interference with contract were dismissed by the trial court, which decision was affirmed by this court. *Chariot*

---

[1]Due to the bankruptcies of Eastmet Corporation, Harry Davies and UIPE, the judgment below was entered only as to Zalk Josephs. Consistent with the usage of the parties, Eastmet Corporation and its three subsidiaries are collectively referred to as "Eastmet." "Eastmet Corporation" refers to the parent company alone.

*Holdings, Inc. v. Eastmet Corp.* (1986), 146 Ill. App. 3d 1160 (unpublished Rule 23 order), *appeal denied* (1987), 113 Ill. 2d 572.

The agreement in issue provided that the transfer of the business would occur on December 3, 1985, unless extended pursuant to section 13.4 of the agreement. Section 13.4 provided:

> "In the event that the Closing is not consummated on or before December 3, 1985, it shall be automatically extended to December 16, 1985 or such earlier date as Buyer may indicate \*\*\*. If the closing has not been consummated on or before December 16, 1985, this Agreement shall be deemed to have been terminated \*\*\*."

The agreement also required Heisley to deliver "immediately available funds" to Eastmet at the closing. With respect to the purchased real estate, Heisley was required to have a title policy delivered at closing to insure in advance against any exceptions to title which might arise during the gap between the date of the title commitment and the date the buyer's deeds were recorded.

Between November 1, 1985, and December 16, 1985, when the transaction was to be consummated, the sellers received a revised business plan from an independent consultant indicating that it would be more advantageous for Eastmet to keep the five businesses. At the same time, Richard Gray, the largest shareholder in Eastmet, who was then negotiating his representation on and subsequent chairmanship of Eastmet's board of directors, publicly announced his intention to influence the sellers not to consummate the transaction with Heisley.

On November 22, 1985, Gray (and related companies) filed with the Securities and Exchange Commission a schedule 13 D statement in which he declared his intention to "influence management in whatever way legally possible to not proceed with the sale of the industrial Products Group of the Company to a third party [Heisley] as recently proposed by the Company." Eastmet's intentions relative to the agreement were further reflected in the fact that four days prior to the scheduled closing, sellers' consultant prepared a written business plan for Eastmet which included long term cash flow projections for the five businesses that were to be sold to Heisley in four days.

At the scheduled closing on December 16, 1985, Heisley's representatives had over $10.9 million in funds provided by three separate lenders. Two lenders had transferred $4.9 million to a closing escrow account which had been opened by Chicago Title and Trust to accomplish the transaction, and a representative of Heller Finan-

cial Corporation was present with a certified check for $6 million. In addition, Heisley had lined up, but did not use, other available sources of money, including $3 million from Mount Prospect State Bank.

The real estate escrow account had been established pursuant to section 15.5 of the agreement which provided in pertinent part that, "The sale of the Real Estate contemplated by this Agreement shall, if required by Buyer's lenders, be closed through an escrow with the title company selected by such lender ***." Both Heller Financial and BT Private Clients Corporation, another of Heisley's lenders, had requested that the closing be handled through an escrow account. Heisley sought to use a five-day escrow because various lien releases, mortgage releases, and Uniform Commercial Code termination agreements for the property at issue were not physically available at the closing.

Mr. Dausch, Eastmet's representative at the transaction, rejected the use of the five-day escrow. After consultation with Eastmet's lenders, he informed Heisley that he would consent only to a one-day escrow whereby documents would have to be recorded and funds disbursed by 9 a.m. on December 17. As a consequence, the transaction did not close as scheduled. Within three days Heisley filed a counterclaim against the four sellers for specific performance of the agreement, damages, and other relief. He also sought and was granted a temporary restraining order to maintain the status quo of the businesses pending a trial on the merits.

On January 6, 1986, Eastmet Corporation filed a bankruptcy petition in Maryland which stayed all proceedings against the corporation (11 U.S.C., sec. 362 (Supp. III 1985)) and precluded the sale of its two divisions, Aelco and Belgium, to Heisley. Eastmet removed Heisley's claims to Federal court in Chicago (including Heisley's action as against the three other sellers) and sought to transfer the entire action to the Maryland bankruptcy court.

The Chicago Federal court remanded Heisley's action against the three other sellers back to the State court for trial, and upon Eastmet's motion, transferred Heisley's action as against Eastmet to Maryland. The three solvent sellers subsequently moved in State court to have Heisley's action against them dismissed or stayed by reason of the automatic stay enjoyed by Eastmet.

When this motion was denied, Eastmet moved in the Maryland bankruptcy court to have its automatic stay extended to the Illinois State court action against the three other sellers. Following the denial of that motion, Heisley moved to lift the automatic stay as to

Eastmet Corporation in order that his specific performance claims could be tried against all four sellers in the Illinois State court. Eastmet opposed that motion and it was denied.

A bench trial on Heisley's specific performance claims commenced on March 19, 1986, and the court ruled in favor of Heisley. On April 29, 1986, the day the proposed judgment was submitted to the court, two of the three sellers (Harry Davies and UIPE) filed voluntary Chapter 11 bankruptcy petitions in Maryland bankruptcy court. As a result, the judgment for specific performance was entered only as to Zalk Josephs. Zalk Josephs now brings this appeal.

Its first contention is that as a matter of law, Heisley was not ready, willing, and able to perform on December 16, 1985, and accordingly, the agreement terminated by its express terms. As evidence that Heisley was unable to perform, Zalk Josephs argues that Heisley did not have immediately available funds on December 16; that he did not have the title policy delivered at the closing; and that he refused to either waive the *lis pendens* exception or terminate the contract, all of which were material to and required by the agreement. Although Zalk Josephs cites various findings of the trial court as evidence of appellee's fundamental and material failure to perform, the trial court specifically concluded that Heisley was ready, willing, and able to consummate the transaction in entering the decree of specific performance.

■ In reviewing a grant of specific performance we are bound by certain fundamental principles. Since the granting of specific performance is a matter of sound judicial discretion controlled by established principles of equity, such a decree will not be disturbed absent an abuse of discretion. (*Thread & Gage Co. v. Kucinski* (1983), 116 Ill. App. 3d 178, 185, 451 N.E.2d 1292, *appeal denied* (1983), 96 Ill. 2d 566; *Djomliga v. Urban* (1982), 107 Ill. App. 3d 960, 967, 438 N.E.2d 558.) If the judgment of the trial court is justified in the law for any reason or ground appearing in the record, we will affirm the judgment. *Thornton v. Williams* (1980), 89 Ill. App. 3d 544, 549, 412 N.E.2d 157.

Zalk Josephs bases its argument that Heisley was unable or unwilling to deliver the money on December 16, 1985, on the fact that Heisley sought to put the funds into a five-day escrow on December 16. The trial court found that under the escrow, the seller would get its money, if at all, not on December 16 as originally agreed to, but on December 21. Uncontroverted testimony showed, however, that a total of $10.9 million in "immediately available funds" was provided by Heisley's lenders on December 16 and the trial court found that

although the escrow closing extended the closing date beyond the date originally fixed by the parties, the escrow closing served the objectives and intentions of the parties as set forth in the agreement and the sellers were not prejudiced by the extension.

 Our reading of the agreement supports the trial court's finding that the agreement expressly contemplated that the sale could be closed through an escrow and that the sellers were contractually obligated to "execute, acknowledge and deliver" any "documents as may be reasonably necessary to carry the transactions contemplated by this Agreement." Section 15.5 of the agreement also permitted the use of an escrow closing if requested by the buyer's lenders, and the record shows that sellers were advised that Heisley's lenders had made such a request a week or more prior to the closing. We see no inconsistency between the requirement of "immediately available funds" and disbursement through an escrow. Substantial uncontroverted testimony in the record indicates that an escrow of this type would be both usual and reasonable for a complex multi-State transaction of this kind.

Under the agreement, Heisley also was required to have his title policy delivered at the closing, with the title company underwriting the risk of undisclosed defects arising during the gap between the commitment and recording dates. While the evidence showed that Heisley failed to have his title policy delivered at closing and had not arranged for the title company to underwrite the risk of intervening defects, the trial court found, in essence, that the absence of the title policy at closing was immaterial as time was not of the essence.

 More importantly, the title insurance commitment was for the benefit of Heisley and his lenders, not for the sellers. The receipt by Heisley of a title commitment was a condition to *his* and not the sellers' obligations. By the time of the closing, Heisley had already obtained the commitments of Chicago Title and Trust Company to issue the necessary insurance. Under the circumstances, we believe the trial court correctly found that the absence of the title policy at the December 16 closing did not constitute a fundamental and material failure to perform.

 Nor are we persuaded that the Gray *lis pendens* was a bar to the transaction. The *lis pendens* relied upon by Zalk Josephs to avoid the agreement was predicated on a lawsuit which was found to be without merit by the trial court and by this court on appeal. (*Chariot Holdings, Inc. v. Eastmet Corp.* (1986), 146 Ill. App. 3d.) There is no testimony in the record to support Zalk Josephs' argu-

ment that the Gray *lis pendens* would have kept the escrow from disbursing, and the record shows that none of Heisley's financing was affected by or contingent upon the Gray *lis pendens*. In addition, Chicago Title and Trust had delivered to Heisley's lawyers a title endorsement which unconditionally insured against any loss or damage incurred in connection with Gray's suit against Eastmet. Accordingly, we concur with the trial court's finding that the Gray *lis pendens* was not a material issue on December 16, 1985.

Zalk Josephs also contends that the trial court erred as a matter of law in finding that time was not of the essence in this contract. Relying on the language of section 13.4 which stated that the contract was "deemed to have terminated" if the transaction were not consummated on or before December 16, it argues that this constitutes an express "time is of the essence" clause and cites *Boise Cascade Home & Land Corp. v. Utilities, Inc.* (1984), 127 Ill. App. 3d 4, 9, 468 N.E.2d 442, to support its argument that because the contract was neither silent nor ambiguous, the court was bound by the plain meaning of the contract and was not, therefore, free to consider such extrinsic matters as whether Eastmet would have been prejudiced by the five-day extension.

Despite Zalk Josephs' insistence that time was of the essence, the contract contains no clause that expressly provides that "time is of the essence," and the circumstances and facts before us do not suggest that the parties intended that time was an essential element of the contract at the time the contract was entered into. Virtually all agreements establish dates for performance or termination. Although the agreement at issue set December 16 as the date for performance, or conversely termination, nowhere in the agreement did the parties mutually agree that this date was the "essence" of the agreement.

■ Under the law of Illinois, time requirements "even when attached to explicit termination provisions *** are by their nature accessory rather than central aspects of most contracts." (*Sahadi v. Continental Illinois National Bank & Trust Co.* (7th Cir. 1983), 706 F.2d 193, 198.) Even where the contract contains an express clause stipulating that "time is of the essence," Illinois courts will inquire into the situation of the parties and the underlying circumstances to determine whether a delay in performance resulted in a "material breach." *Janssen Brothers, Inc. v. Northbrook Trust & Savings Bank* (1973), 12 Ill. App. 3d 840, 844, 299 N.E.2d 431.

Zalk Josephs relies on *Schneider v. Dumbarton Developers, Inc.* (D.C. Cir. 1985), 767 F.2d 1007, in which the court denied specific

performance based on a purchaser's failure to comply with a "time is of the essence" clause in a real estate contract. The facts in *Dumbarton* are, however, substantially dissimilar to those in the case at bar and therefore are not persuasive on the issue of Heisley's request for a five-day escrow.

In *Dumbarton*, the underlying sales agreement, entered in February 1981, provided for 120 days to consummate the transaction. The purchasers were given two postponements of the agreed closing date, both of which they failed to meet. After the seller announced that the sale had to be closed by May 17, 1982, or the agreement would terminate, the purchaser fell short a third time and the sellers sued to terminate the agreement. The suit was then settled pursuant to an agreement which required consummation of the transaction on or before October 4, 1982, "time being of the essence."

The purchasers in *Dumbarton* had also agreed that "the time for [performance] may not be further extended for any reason whatsoever" and that they "waived and relinquished" all rights to purchase the property if the transaction was not consummated as scheduled. (*Schneider v. Dumbarton Developers, Inc.* (D.C. Cir. 1985), 767 F.2d 1007, 1010.) In regard to the October 4 closing, the district court in *Dumbarton* found that the buyer had not substantially performed because on that date the buyer did not have all his money available and did not inform the seller who the grantee would be. It was, therefore, against a substantially different background than the one before us that the district court in *Dumbarton* ordered a termination of the agreement.

■ It is of course correct that the intent of the parties regarding time may be inferred from the circumstances of the transaction as well as from the express language. (*King v. Stevenson* (7th Cir. 1971), 445 F.2d 565,569; *Will v. Will Products, Inc.* (1982), 109 Ill. App. 3d 778, 782, 441 N.E.2d 343.) But other than the agreed termination date, which we do not believe is conclusive as to the parties' intent regarding time, we do not believe that the circumstances here warrant termination of the intended sales transaction if the payment was not received by December 16 or through the one-day escrow on December 17. In our opinion, the trial court properly focused upon the prejudice that would result from delay and on the complexity of the task to be performed in concluding that the five-day escrow constituted performance within a reasonable time. See *Guel v. Bullock* (1984), 127 Ill. App. 3d 36, 42, 468 N.E.2d 811; *Janssen Brothers, Inc. v. Northbrook Trust & Savings Bank* (1973),

12 Ill. App. 3d 840, 844, 299 N.E.2d 431.

Although Zalk Josephs argues that it was in fact prejudiced because the transaction was no longer in its interest and because Eastmet could not have proceeded with the five-day escrow without risking default on its agreements with its own lenders, neither of these arguments is persuasive. The seller was obligated to proceed with the terms of the contract as it was agreed to by the parties on November 1, 1985, irrespective of its revised business plan.

■ In respect to Zalk Josephs' assertion that Eastmet could not have extended the date because of pressure from its own lenders, evidence in the record shows that its lenders readily acquiesced to the one-day extension from December 16 to December 17 and were never queried as to whether an escrow extension until December 21 would be acceptable. Dausch himself admitted that it would not have made any difference had the transaction closed at any time between December 16 and December 31. Under these circumstances, where the buyer has made all the reasonable and necessary efforts to perform, the trial court did not err in considering that the seller was not prejudiced. See *Janssen Brothers, Inc. v. Northbrook Trust & Savings Bank* (1973), 12 Ill. App. 3d 840, 844, 299 N.E.2d 431.

Zalk Josephs also urges that the trial court's finding that sellers breached the covenant of good faith and fair dealing was against the manifest weight of the evidence. After consideration of the record and the relevant portions of the agreement, we do not agree.

■ In Illinois, the obligation of good faith and fair dealing is implied in every contract. (See, *e.g. Martindell v. Lake Shore National Bank* (1958), 15 Ill. 2d 272, 286, 154 N.E.2d 683; *Dayan v. McDonald's Corp.* (1984), 125 Ill. App. 3d 972, 989-90, 466 N.E.2d 958, *appeal denied* (1984), 101 Ill. 2d 581.) In the present case, moreover, the agreement contained explicit obligations to act reasonably and in good faith. In regard to the real estate to be sold, each of the sellers agreed to "perform and fully discharge" the following:

> "6.9 *Real Estate Matters.* Sellers shall each act in good faith and use their best efforts to satisfy all of their obligations under Article XV hereof."

In turn, one of the sellers' obligations under article XV of the agreement was to close through an escrow. As the agreement provides:

> "15.5 *Real Estate Escrow.* The sale of the Real Estate contemplated by this Agreement shall, if required by Buyer's lenders, be closed through an escrow with the title company ***."

Finally, article XV obligates the sellers to provide reasonable assistance to Heisley:

> "15.7 *Assistance To Be Provided By Sellers.* Sellers shall each provide Buyer with such assistance as Buyer may reasonably request in connection with the actions to be taken by Buyer under this Article XV."

■ The sellers' conduct both immediately prior to and at the closing on December 16, 1985, demonstrates instead the intent to work against the consummation of the agreement. The record shows that on December 2, 1985, the sellers formally adopted a revised business plan which made it preferable not to consummate the transaction with Heisley and instructed Dausch that he was not to extend the agreement under any circumstances. Dausch testified at trial that when he walked out of the December 16 closing he did not consider whether the escrow was reasonable; he considered only the constraints imposed upon him by the Eastmet board.

The sellers' failure to proceed reasonably and in good faith is further evidenced by the manner in which Dausch proposed to close the transaction. Dausch insisted on closing through an "overnight escrow" where the monies would be disbursed at 9 a.m. on December 17. In regard to the title documents being held in other cities, there was no testimony that any arrangements had been made or could have been made to deliver funds by 9 a.m. the following morning as Dausch insisted upon.

While consistent with the sellers' desire not to sell, Dausch's requirement was a breach of the sellers' obligation to proceed reasonably and in good faith toward consummation of the transaction through an escrow. In our opinion, the trial court's finding that the sellers failed to act in a commercially reasonable manner by insisting on the December 17 payment and refusing Heisley the five-day escrow agreement was not contrary to the manifest weight of the evidence.

■ We next consider Zalk Josephs' contention that Eastmet Corporation was a necessary party and that the trial court erred in proceeding to a decision on the merits in its absence. A necessary party is an individual or entity having a present, substantial interest in the matter being litigated, and in whose absence a complete resolution of the matter in controversy cannot be achieved without affecting that interest. (*Bovinett v. Rollberg* (1979), 73 Ill. App. 3d 490, 494-95, 392 N.E.2d 27.) It is error for a court to hear and dispose of a case on the merits without jurisdiction of necessary parties, and an order entered in the absence of a necessary party is

void. *Klingel v. Kehrer* (1980), 81 Ill. App. 3d 431, 440, 401 N.E.2d 560; *Moore v. McDaniel* (1977), 48 Ill. App. 3d 152, 156, 362 N.E.2d 382, *appeal denied* (1977), 66 Ill. 2d 631.

■■ Zalk Josephs' argument that Eastmet is a necessary party is predicated upon the fact that although the Eastmet subsidiaries were individual parties to the agreement, the agreement specifically provided that the entire purchase price was to be paid to Eastmet Corporation rather than to the subsidiaries. Zalk Josephs also claims that Eastmet Corporation was necessary to the litigation because the agreement did not allocate portions of the purchase price between the parent and each of the subsidiaries.

As further support for its argument, Zalk Josephs notes that Eastmet had the sole responsibility to (1) accept certain long term secured indebtedness from Heisley in lieu of cash; (2) subordinate its security interests to security interests from Heisley's other lenders; (3) purchase the Industrial Revenue Bonds held by Aetna Casualty and Surety Co. and secured by UIPE's assets; (4) execute and deliver documents releasing its mortgages under certain conditions; (5) cure title defects or cause them to be insured over; and (6) prepare the preliminary and closing balance sheets.

We are not persuaded by Zalk Josephs' contention that Eastmet Corporation's presence was necessary because all of the consideration was to be paid to Eastmet. Under provision 2.1 of the agreement, Eastmet had no substantive right to the consideration. The provision merely established that Eastmet was to receive the monies as agent for the remaining sellers; in the words of the agreement, "on behalf of itself and each of the subsidiaries." Even if Eastmet Corporation did have a substantive right to the money, it did not have to be a party to the litigation or the transaction in order to receive it.

Zalk Josephs' contention that Eastmet Corporation's presence was necessary at trial because the agreement did not permit an allocation of the purchase price among the respective sellers is similarly unpersuasive. According to the uncontested evidence, the provision upon which this agreement was based was intended solely to give the parties flexibility in their tax planning. Testimony at trial showed that by that provision, the parties merely agreed not to set a capitalized tax basis for any of the individual businesses. In regard to the various alleged contractual obligations of Eastmet raised by Zalk Josephs, we believe that the trial court correctly found that none was a bar to consummating the transaction.

Even if we were to decide that Eastmet had a sufficient interest

in this controversy, we would not require its joinder as a necessary party, as the remaining sellers, who had the same interests as Eastmet, more than represented those interests at trial. (See *Moore v. McDaniel* (1977), 48 Ill. App. 3d 152, 362 N.E.2d 382, *appeal denied* (1977), 66 Ill. 2d 631.) Here, the remaining sellers were not only under the admitted control of Eastmet, but proceeded through trial with the same counsel as initially represented Eastmet and with all the same witnesses, including their chief witness, Mr. Dausch, Eastmet's president and member of its board.

We disagree with Zalk Josephs' contention that the "doctrine of representation" is not applicable here under *Tri-Mor Bowl, Inc. v. Brunswick Corp.* (1977), 51 Ill. App. 3d 743, 747, 366 N.E.2d 941, because the "whole controversy" could only be disposed of in the Maryland bankruptcy court. Although the parties disagree as to whose conduct resulted on the ultimate severance of the specified performance action from the bankruptcy action, it appears that Heisley's claims against the three solvent counterdefendants were not "core proceedings" under the Bankruptcy Code (See 28 U.S.C. sec. 157 (Supp. II 1984)), and thus were properly remanded to the State court. In our view, the "whole controversy" consisted of the specific performance and related claims against Eastmet's wholly owned subsidiaries.

Appellant also contends that partial specific performance was an inappropriate remedy as the agreement contemplated the sale of EIPG's assets or none at all. According to Zalk Josephs, this was a sale of an ongoing business and as the assets were to be sold as a group with the purchase price directed to the group rather than individual assets, the court erred in awarding partial specific performance. We do not agree.

■ When the property intended to be transferred is real property and unique personal property, as the property was here, such property is subject to a decree of specific performance. (*Dunham v. Slaughter* (1915), 268 Ill. 625, 109 N.E. 673. *Accord, Kuhn v. Sohns* (1926), 324 Ill. 48, 53, 154 N.E. 401.) The object of courts of equity is to enforce rather than to evade contracts, and our courts have repeatedly held that courts of equity will enforce a valid contract for the sale of unique assets as a matter of right. *In re Estate of Frayser* (1948), 401 Ill. 364, 371-72, 82 N.E.2d 633.

■ Here it appears that the sellers sought to avoid specific performance by removing some of their assets and parties from the litigation. However, we believe that under both the agreement and relevant case law, this did not preclude the enforcement of the

agreement as to Zalk Josephs alone.

Under the agreement, each seller warranted as follows: "Seller and each of the subsidiaries, jointly and severally, represent and warrant to Buyer as of the date hereof, and as of the Closing as follows." Each of the sellers also severally warranted under article IV of the agreement that (i) they had the "full legal right, power and authority" to carry out the agreement; (ii) the documents to be executed at closing constitute binding obligations of each of the sellers; and (iii) each has good and marketable title to their respective assets. Although the parties originally contemplated sale of the five businesses as a group, based upon one consideration, the language of the agreement showed that the sellers considered and acknowledged their "several" obligations under the contract. Since the promise was both joint and several, it follows that the buyer had the right to pursue remedies to enforce both the joint and several obligations of the sellers. See *Cities Service Oil Co. v. Viering* (1949), 404 Ill. 538, 546, 89 N.E.2d 392.

In further support of Heisley's assertion that the agreement was severable, we note that the sellers' own witnesses testified that each of the five companies covered by the agreement was separately owned and totally unrelated in terms of the business they do. The agreement also provided a formula for pricing the separate assets, and Heisley presented a credible expert who testified to how the formula would apply. As the sellers presented no contradictory evidence, we conclude that the trial court did not err in awarding appellee partial specific performance as to the assets of Zalk Josephs.

The agreement had been for the sale of all five EIPG companies. In exchange for the five companies Heisley was to pay a purchase price consisting of cash at closing plus two long term notes. The first note (the nonoffset note), was to be for the entire portion of the purchase minus $1.5 million. The second note (the offset note) was to be in the amount of $1.5 million, with Heisley having an automatic right to offset against payments on that note any breach-of-warranty claims against the sellers. Both notes permitted Heisely to postpone payments in accordance with a specified formula if the total earnings levels for all five companies were less than $2.5 million in a given fiscal year.

Zalk Josephs now argues that adjustment should have been made to the amount of the offset note and to the level of earnings entitling Heisley to postpone payments to reflect the fact that Heisley ultimately purchased only one of the five companies.

The sole reason Zalk Josephs offers for the requested adjust-

ment is that the three other sellers are now out of the case by reason of having filed petitions for bankruptcy. Under these circumstances, we believe the trial court did not abuse its discretion when it refused to adjust the long term notes.

The offset note was designed to protect Heisley in the event that one or more of the sellers breached their warranties or representations to Heisley. In that event, Heisley was entitled to offset his damages by reason of such breaches, up to $1.5 million. In light of the three bankruptcies filed, the assets available to Heisley to satisfy his damage claims have been substantially diminished. In our opinion, the trial court acted within its discretion by not allowing the sellers to take advantage of their own conduct and reduce the amount of the offset note.

We believe the trial court also acted within its discretion in rejecting Zalk Josephs' suggestion that the amortization schedule of the two notes should have been changed because three of the sellers had removed themselves from the case. Under the agreement, the amortization schedule was subject to change only in the event that Heisley elected to sell one of the companies to pay off debt. Nowhere in the agreement does it suggest that the sellers could take advantage of this provision and although this result may be detrimental to the sellers, the sellers cannot complain of detriment sustained as a result of its own conduct. See *Yonan v. Oak Park Federal Savings & Loan Association* (1975), 27 Ill. App. 3d 967, 977, 326 N.E.2d 773, *appeal denied* (1975), 60 Ill. 2d 602.

In summary, the trial court's findings that Heisley was ready, willing, and able in all material respects to consummate the transaction and that the sellers failed to act in a commercially reasonable manner, thereby frustrating the intent of the agreement, are not against the manifest weight of the evidence. The remedy of partial specific performance was within the sound discretion of the trial court and accordingly, the judgment of the trial court is affirmed.

Judgment affirmed.

CAMPBELL and BUCKLEY, JJ., concur.