**NONPRECEDENTIAL DISPOSITION**

To be cited only in accordance with FED. R. APP. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued December 12, 2014
Decided September 9, 2015

**Before**

ILANA DIAMOND ROVNER, *Circuit Judge*

ANN CLAIRE WILLIAMS, *Circuit Judge*

JOHN DANIEL TINDER, *Circuit Judge*

| | |
|---|---|
| No. 13-3365 | |
| JNS POWER AND CONTROL SYSTEMS, INC., | Appeal from the United States District Court for the Northern District of Illinois, Eastern Division. |
| *Plaintiff-Appellee,* | |
| *v.* | No. 13 CV 03124 |
| 350 GREEN, LLC, | Elaine E. Bucklo, |
| *Defendant-Appellant.* | *Judge.* |

**O R D E R**

This case concerns a dispute over the ownership of certain assets including electric vehicle chargers previously owned by 350 Green, LLC. The district court granted summary judgment to JNS Power and Control Systems ("JNS") and ordered specific performance. We affirm the district court's ruling. Although 350 Green maintains that JNS lacked standing to make any arguments as to the enforceability of a March 8, 2013 Equity Exchange Agreement to which JNS was not a party, JNS simply responded to arguments and defenses that 350 Green raised. Next, we agree with the district court that

the March 8 Exchange Agreement did not prevent 350 Green from validly entering into an asset purchase agreement to transfer the assets in question. The Exchange Agreement did not close by the date specified in the agreement, and a demand for a non-compete agreement constituted a counteroffer. Finally, the district court did not abuse its discretion when it ordered specific performance in light of the unique nature of the electric car chargers and the agreements related to them.

## I. BACKGROUND

The City of Chicago awarded 350 Green a $1.9 million grant in October 2010 to install electric car charging stations in the Chicago area. On June 14, 2012, the City sent 350 Green a Notice of Default on the agreement governing the Chicago project. 350 Green's members, Mariana Gerzanych and Timothy Mason, then began negotiating with Car Charging Group, Inc. ("CCGI") for the sale of all their membership interests in 350 Green. The interests would go to a new CCGI subsidiary, 350 Holdings.

CCGI, 350 Holdings, 350 Green, and the 350 Green members entered into an Equity Exchange Agreement with an "Effective Date" of March 8, 2013. Under the Exchange Agreement, the 350 Green members would transfer all their membership interests in 350 Green to 350 Holdings, and in return CCGI would issue CCGI stock shares to the 350 Green members. The Exchange Agreement provided that the transaction was to close "no later than ten (10) business days after the Effective Date" of the agreement, i.e., no later than March 22, 2013.

On the morning of March 21, 2013, the day before the deadline, 350 Green and its members sent their executed closing documents to CCGI. CCGI's counsel confirmed receipt but stated counsel was not authorized to circulate CCGI's executed documents and advised 350 Green and its members that "we have not yet closed." 350 Green's counsel called CCGI's in-house counsel and stated that 350 Green would consider the transaction expired if not closed by the close of business on March 22, the date required by the Exchange Agreement.

The next day, Friday, March 22, CCGI's counsel emailed 350 Green and its members, attaching a six-month non-compete agreement as well as an addendum to extend the closing date until March 25 in case CCGI was not able to sign its documents by the end of the business day on March 22. The email stated that 350 Green must first sign and return both documents before CCGI would send CCGI's executed Exchange Agreement signature pages. Neither 350 Green nor its members signed the non-compete agreement or addendum. By Monday, 350 Green members were describing the deal as

"terminated" and "cancelled." On Tuesday, March 26, CCGI sent its executed signature pages of the Exchange Agreement to 350 Green.

About two weeks later, on April 9, 2013, CCGI and 350 Holdings filed suit in federal court in New York to compel 350 Green and its members to close the transaction pursuant to the Exchange Agreement. By that point, 350 Green and its members were already discussing other opportunities beyond CCGI. Indeed, on April 17, 2013, 350 Green and its members signed an Asset Purchase Agreement ("APA") with JNS for the transfer of certain assets. These assets included 168 completed and installed electric car chargers and 51 uninstalled chargers to be used for service at electric vehicle charging stations in the Chicagoland area. The APA provided that the deal would close in two stages, first upon the APA's signing and second when contingencies set forth in the APA were satisfied. The contingency JNS had to fulfill was the City's acceptance of the APA terms. JNS obtained the City's acceptance on April 30, 2013.

Before that, however, CCGI, 350 Holdings, 350 Green, and the 350 Green members entered into an Addendum to the Exchange Agreement. The Addendum amended the March 22, 2013 closing date to April 22, 2013, and it also gave CCGI the right of first refusal to match the terms of any electric-vehicle related business opportunities presented to the 350 Green members for twelve months beginning on April 22, 2013. CCGI and 350 Holdings recognized in the First Addendum that 350 Green had entered into the APA with JNS.

Eight days after the APA's execution, on April 25, 2013, CCGI and 350 Holdings filed suit against JNS in the United States District Court for the Northern District of Illinois. CCGI and 350 Holdings's complaint sought a declaration that the APA was void, as well as damages for tortious interference with a contract. On May 6, 2013, JNS demanded via a letter from its counsel that 350 Green perform under the APA. CCGI, 350 Holdings, and 350 Green refused to comply, asserting that the APA was void and not binding.

On May 30, 2013, JNS filed its own complaint in federal court in Illinois. It sought 350 Green's specific performance under the APA and sought indemnification from 350 Green. After expedited discovery, the district court granted JNS's motion for partial summary judgment. 350 Green appeals.

## II.  ANALYSIS

We review the district court's grant of summary judgment de novo. *Mintz v. Caterpillar Inc.*, 768 F.3d 673, 679 (7th Cir. 2015). In doing so we view the record in the light most favorable to 350 Green and draw all reasonable inferences from the evidence in its favor. *Id*. Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

Contract interpretation is particularly suited to resolution by summary judgment. *Hickey v. A.E. Staley Mfg.*, 995 F.2d 1385, 1389 (7th Cir. 1993).

### A. No Standing Bar to JNS's Response to 350 Green's Claim that Exchange Agreement Made APA Null and Void

350 Green, through its new membership, maintains that at the time 350 Green entered into the APA, 350 Green was bound to the March 8, 2013 Exchange Agreement between it and CCGI. The consequence, according to 350 Green, is that 350 Green could not validly enter into the APA. JNS, however, contends that the Exchange Agreement did not prevent 350 Green from entering into the APA on April 17, 2013 and that the APA is an enforceable contract.

The first argument 350 Green makes on appeal is that JNS lacks standing to ask the court to interpret the March 8, 2013 Exchange Agreement because JNS is neither a party to nor an intended third-beneficiary of that agreement. In support, it points to cases under Florida law, which governs the Exchange Agreement, holding that a non-party to a contract cannot seek to enforce an agreement unless the party is an intended third-party beneficiary of the contract. *See, e.g., Metro. Life Ins. Co. v. McCarson*, 467 So. 2d 277, 279 (Fla. 1985); *Sun Commodities, Inc. v. C.H. Robinson Worldwide, Inc.*, No. 11-627380-CIV, 2012 WL 612616 (S.D. Fla. Feb. 23, 2012).

JNS, however, is not seeking to enforce the March 8, 2013 Exchange Agreement between CCGI and 350 Green. JNS's complaint against 350 Green seeks relief based only on the APA; JNS is seeking to enforce the APA, not the Exchange Agreement. Perhaps recognizing that JNS is not attempting to enforce the Exchange Agreement, 350 Green asserts that an entity that is not a party or an intended beneficiary also cannot "interpret" the contract. But it was 350 Green who put the Exchange Agreement at issue in this case, not JNS. 350 Green asserted as an affirmative defense to JNS's complaint, and argued again in the summary judgment briefing, that the Exchange Agreement barred JNS's claims. In response to these assertions and to arguments from 350 Green, JNS addressed and discussed the Exchange Agreement. There is no reason that JNS could not respond to 350 Green's affirmative defense and arguments at summary judgment based on the Exchange Agreement by making its own arguments as to what the Exchange Agreement means. There is no standing problem here.

### B. March 8, 2013 Equity Exchange Agreement Did Not Prevent 350 Green from Entering into APA

350 Green also maintains that the March 8, 2013 Exchange Agreement was binding upon it at the time it entered into the APA, or at the least that there is a genuine issue of

material fact on this issue. The result of being bound to the March 8 Exchange Agreement terms, 350 Green contends, is that the later-signed APA is void.

The Exchange Agreement did not close within ten business days after its effective date (i.e., it did not close by March 22, 2013) as required by the contract's terms. Nonetheless, 350 Green maintains that the passage of that date without closing is not dispositive as to whether the Exchange Agreement is enforceable. Rather, 350 Green contends that the Exchange Agreement became enforceable when CCGI sent its executed signature pages on March 26, four days after the Exchange Agreement's required closing date.

350 Green emphasizes that the Exchange Agreement did not contain a "time is of the essence clause," nor did it contain a specific closing date. 350 Green also contends that what it terms CCGI's "brief delay" in closing should be excused here on the basis that the 350 Green members did not notify CCGI that time was of the essence, did not state that they considered CCGI to be in default because of the delayed closing, and did not suffer damages. Without notice of default and an opportunity to cure, 350 Green argues the March 22 deadline did not have to be met for the Exchange Agreement to be enforceable, and it maintains that the signed pages CCGI sent four days later put the agreement into effect. We disagree that the later-signed pages made the agreement enforceable.

The lack of a "time is of the essence" provision here does not help 350 Green. 350 Green points to cases under Florida law supporting the proposition that when there is not a "time is of the essence" provision in a contract, Florida law frowns on strict enforcement of deadlines. But the cases to which 350 Green points largely concern strict enforcement of *performance* deadlines without notice and an opportunity to cure, after contract formation. *See, e.g., McNeal v. Marco Bay Assocs.*, 492 So. 2d 778, 781 (Fla. Dist. Ct. App. 2006). Our case, though, concerns not a delay in performing a contract once formed but rather a "delay" in forming a contract. 350 Green also cites an unpublished decision, *Inspiration Yacht Charters, Inc. v. Inspiration Yacht Charters II, Inc.,* 488 Fed. App'x 408 (11th Cir. 2012), but there both parties had executed closing documents on the closing date. Here, CCGI had not completed any obligations on the closing date, and had not yet accepted the offer.

350 Green cites *Henry v. Ecker*, 415 So. 2d 137 (Fla. Dist. Ct. App. 1982) for the proposition that time is not of the essence in Florida law unless the contract so expressly provides, but that is not what the case says. Rather, that case says, "Time is not of the essence in contracts *for the sale and purchase of real estate* unless the contract so provides." *Henry*, 415 So. 2d at 140 (emphasis added). Our case, however, does not involve the sale or purchase of real estate.

Instead, under Florida law,

> The law is clear that generally "time is considered to be of the essence where an agreement specifies, or where such may be determined from the nature of the subject matter of the contract, or where treating time as non-essential would produce hardship, or where notice has been given to the defaulting party requiring that the contract be performed within a stated time, which must be reasonable according to the circumstances."

*Command Sec. Corp. v. Moffa*, 84 So. 3d 1097, 1100 (Fla. Dist. Ct. App. 2012) (quoting *Sublime, Inc. v. Boardman's Inc.*, 849 So. 2d 470, 471 (Fla. Dist. Ct. App. 2003)). On March 21, 2013, CCGI's in-house counsel emailed 350 Green's counsel stating that the Exchange Agreement was not closed and then later that day sent an email to the 350 Green members with a proposed addendum to extend the closing date. 350 Green's counsel John Pierce, whose affidavit is in the record, responded to CCGI's counsel that same day "in no uncertain terms that 350 Green would consider the transaction to be expired if not closed by the close of business on March 22, 2013, the date mandated in the Exchange Agreement." No other evidence contradicts this assertion to create a genuine issue of material fact. The time period for performance was also reasonable. 350 Green stated via counsel on March 21 that the closing date remained the following day. Though short, that was not unreasonable as the only action required was to send CCGI's signature pages. And CCGI admitted that the signature pages were already signed and ready to be delivered before March 22.

Not only was the delay here at the contract formation stage, but CCGI's signed documents were contingent upon new terms—the six-month noncompetition and solicitation agreement. As the district court found, that response was "not merely a 'brief delay' in CCGI's performance, but rather CCGI's unmistakable attempt to renegotiate the terms of the parties' deal."

"A counteroffer operates as a rejection of a preceding offer." *Ribich v. Evergreen Sales & Service, Inc.*, 784 So. 2d 1201, 1202 (Fla. Dist. Ct. App. 2001); s*ee also Polk v. BHRGU Avon Properties*, LLC, 946 So.2d 1120, 1123 (Fla. Dist. Ct. App. 2006); *Nichols v. Hartford Insurance Co. of the Midwest*, 834 So. 2d 217, 220 (Fla. Dist. Ct. App. 2002). Here, CCGI responded after the deadline with a new demand that 350 Green sign a non-compete agreement and addendum as a condition of CCGI's acceptance. This demand constituted a counteroffer. 350 Green and its members were not obligated to accept the counteroffer, and they did not. *See Nichols*, 834 So. 2d at 220. 350 Green argues that "*Nichols* is completely distinguishable because *Nichols* involved a dispute over a proposed *settlement agreement*. The instant action involves a contract that was already

executed by the parties and is not a case where the parties were attempting to settle a disputed issue and where there was no 'meeting of the minds.'" Reply Br. at 12. That *Nichols* involved a settlement agreement is not a material distinction; *Nichols* is relevant for the basic contract law principles it applies. Moreover, 350 Green's assertion that the instant case involved an already-executed contract begs the question, as CCGI had not delivered its executed documents by the agreement deadline.

In short, as the district court reasoned, "At issue here is not merely a 'brief delay' in CCGI's performance, but rather CCGI's unmistakable attempt to renegotiate the terms of the parties' deal *after* 350 Green and its members had performed their closing obligations under the Exchange Agreement." Mem. Op. & Order, Nos. 13 C 3124 & 13 C 4020, at 14 (Sept. 24, 2013). The cases to which 350 Green points do not support its argument that the March 8, 2013 Exchange Agreement was enforceable. Rather, there is no genuine issue of material fact that the transaction expired on March 22, 2013. The March 8, 2013 Exchange Agreement therefore did not prevent 350 Green from entering into the APA.

### C.  Specific Performance Justified

350 Green also argues that specific performance of the APA is not an appropriate remedy in this case. To state a cause of action for specific performance, there must first be a valid, binding, and enforceable contract. *McCormick Rd. Assocs. L.P. II v. Taub*, 659 N.E.2d 52, 54 (Ill. App. Ct. 1995). 350 Green's only argument on appeal that the APA was not an enforceable contract is that the 350 Green members had no right to terminate or modify the Exchange Agreement by selling off assets that were part of the consideration of that agreement. As we have already explained, the Exchange Agreement did not prevent 350 Green from entering into the APA because the March 8 Exchange Agreement was not enforceable.

The district court's award of specific performance as the remedy is an exercise of equitable discretion that we review for abuse of discretion. *Medcom Holding Co. v. Baxter Travenol Labs., Inc.*, 106 F.3d 1388, 1402 (7th Cir. 1997). As an equitable remedy, specific performance is only available if damages are not adequate as a remedy. *Landers v. Fronczek*, 532 N.E.2d 265, 268 (Ill. App. Ct. 1988). Money damages may not be adequate when the goods to be transferred are unique, so specific performance may be ordered for unique goods. *Ruddock v. First Nat. Bank of Lake Forest*, 559 N.E.2d 483, 487 (Ill. App. Ct. 1990) (ruling rare clock sufficiently unique to warrant specific performance); *Chariot Holdings, Ltd. v. Eastmet Corp.*, 505 N.E.2d 1076, 1085 (Ill. App. Ct. 1987) ("The object of courts of equity is to enforce rather than to evade contracts and our courts have repeatedly held that courts of equity will enforce a valid contract for the sale of unique assets as a matter of right.").

We find no abuse of discretion in the district court's conclusion that the assets to be transferred here are unique and warrant specific performance. The APA assigned to JNS all of 350 Green's rights in the Chicago project, which include the electric chargers, both installed and those purchased with grant funds but not yet installed, along with 350 Green's interests in leases, licenses, and agreements with the hosts for the chargers. The district court concluded that the "chargers and the agreements related to them are unique, as they are, undisputedly integral to the completion of the Chicago Project." A fundamental purpose of the APA was for JNS to obtain those chargers and the corresponding leases; the very purpose of the APA would be defeated if the actual chargers were not included. The 219 chargers sold under the APA were necessary to and integrated with the work that JNS was to perform under the grant as contemplated by the APA. Already, 168 chargers had been installed around the Chicago area, and JNS was liable under the APA on the prior liens attached to those chargers. The chargers in this case were not fungible. While 350 Green argues that JNS failed to provide sufficient evidence that specific performance is warranted in this case, we disagree and find the record sufficient to support the district court's decision. The district court did not abuse its discretion when it ordered specific performance.

## III. CONCLUSION

The judgment of the district court is AFFIRMED.