**FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver for First National Bank of Hammon; Federal Deposit Insurance Corporation, as Receiver for First National Bank of Tipton, Plaintiffs–Appellants,**

v.

**The KANSAS BANKERS SURETY COMPANY, a Kansas Corporation, Defendant–Appellee.**

**Nos. 90–6321, 91–6108.**

United States Court of Appeals, Tenth Circuit.

April 27, 1992.

Eugene J. Comey of Comey & Boyd, Washington, D.C. (David R. Boyd and Sean M. Fitzpatrick of Comey & Boyd, Washington, D.C., James Vogt of Reynolds & Ridings, Oklahoma City, Okl., Robert A. Patrick, Federal Deposit Ins. Corp., Washington, D.C., with him on the briefs), for plaintiffs-appellants.

Deanne Watts Hay of Sloan, Listrom, Eisenbarth, Sloan & Glassman, Topeka, Kan. (Ann L. Hoover and Myron L. Listrom of Sloan, Listrom, Eisenbarth, Sloan & Glassman, Topeka, Kan., James E. Golden, Jr. of Kirk & Chaney, Oklahoma City, Okl., on the brief), for defendant-appellee.

Before ANDERSON, BRORBY and ALDISERT,* Circuit Judges.

BRORBY, Circuit Judge.

This case deals with timely notice of loss to the insurer. The Federal Deposit Insurance Corporation (FDIC) appeals the district court's ruling that the notice requirement provision of two bank fidelity insurance contracts was binding on the FDIC as assignee of the failed banks' claim. The district court found notice was untimely and therefore the FDIC could not recover from the insurance company. The FDIC argues enforcement of the notice provision violates public policy. Alternatively, the FDIC argues the insured banks substantially complied with the provision and the insurer failed to demonstrate prejudice caused by late notice receipt. We affirm.

## I. BACKGROUND

Kansas Bank Surety Company (KBS) is a corporation authorized to transact business as an insurer in the State of Oklahoma. KBS sells only financial institution bonds and officer liability insurance to banks. In 1986, KBS issued Financial Institution Bonds and Excess Bank Employee Dishonesty Bonds to the First National Bank, Hammon, Oklahoma and the First National Bank of Tipton, Tipton, Oklahoma (collectively the Banks). These bonds provided coverage for loss discovered during the insured period. Section 3.[1] *Independent School Dist. No. 1 v. Jackson,* 608 P.2d 1153, 1155 (Okla.1980).

---

* The Honorable Ruggero J. Aldisert, United States Circuit Judge for the Third Circuit, sitting by designation.

1. Section 3 provides the bond covers any "loss discovered by the Insured during the Bond Period. Discovery occurs when the Insured first becomes aware of facts which would cause a reasonable person to assume that a loss of a type covered by this bond has been or will be incurred, regardless of when the act or acts causing or contributing to such loss occurred, even though the exact amount or details of loss may not then be known."

The KBS fidelity bonds are standard policy forms except KBS added the last paragraph of Section 12 which is in dispute. This paragraph requires that KBS receive proof of loss from the Banks before the bonds terminate otherwise any potential right to make a claim against KBS is lost.[2] KBS did not inform the Banks of this change in the standard policy form. However, the FDIC and the Oklahoma Insurance Commission had reviewed and accepted the contracts before KBS entered into the insurance contracts with the Banks.

On September 3, 1987, the Comptroller of the Currency appointed the FDIC as receiver for the Banks. Accordingly, the bonds terminated by their express provision that "[t]his bond terminates ... immediately upon the taking over of the Insured by a receiver." Section 12. Shortly before being placed into receivership, the Banks wrote letters to KBS claiming they had discovered losses involving misappropriation of funds by three officers or directors of both Banks (loss letters). Both letters contain virtually identical language.

Mr. Franklin D. Bailey, president of the First National Bank of Hammon, was informed by either the Office of the Comptroller of the Currency or the FDIC that the Hammon Bank would be closed on September 3, 1987 at 2:00 p.m. About this same time, the Office of the Comptroller of the Currency first informed Mr. Bailey that some of the loans issued by the bank had been used for purchases other than their stated purpose and therefore were not considered good loans.[3] Mr. Bailey testified in his deposition the FDIC suggested the bank officers and directors prepare the loss letter to protect themselves from personal liability. The FDIC representatives aided the Hammon bank employees in preparing the loss letter. The notarized letter was

mailed to KBS shortly before the bank was closed. KBS received the Hammon Bank loss letter on September 8, 1987.

Ms. Patsy Abernathy was the cashier and vice president at the Tipton Bank. On September 3, 1987, the Comptroller closed the Tipton Bank after two examiners from the Comptroller's Office had been in the Tipton Bank every day for a week. Ms. Abernathy's attorney and Mr. James Brewster, a representative from the FDIC, drafted the Tipton loss letter to protect the directors from personal liability. The notarized letter was mailed per Mr. Brewster's instructions before 3:00 p.m. on the day the bank was closed. KBS received the loss letter from the Tipton Bank on September 4, 1987.

KBS refused and denied the FDIC bond claims at the Banks because the bonds were cancelled prior to the time KBS received any proof of loss.

In the district court, the FDIC claimed the loss letters were proofs of loss and were timely and in proper form. Furthermore, the FDIC claimed the fraudulent and dishonest acts related in the loss letter were covered by the terms of the fidelity bond issued by KBS. Thus, the FDIC concluded KBS breached the terms of the fidelity bonds by denying the Banks' claims.

KBS denied violating the bonds' terms. It countered the bonds and any existing claims terminated when the Banks closed because KBS had not received proof of loss before the FDIC was appointed receiver of the Banks.

The parties agreed no factual issues remained surrounding the applicability of Section 12 as a bar to the FDIC's claim. Before a jury trial on the issues, therefore, the court heard arguments regarding Section 12—namely, was it ambiguous and if

**2.** The ordinary notice provision is found in Section 5 which allows the Insured thirty days to give notice and six months to furnish a proof of loss. As the bonds terminated upon the appointment of a receiver, Section 12 and not Section 5 is the applicable notice provision in this case.

**3.** The loss letters from both Banks identified the same three employees as having committed the

acts of dishonesty resulting in the alleged losses to the Banks, Mr. John Hudson, Mr. Jack Rackley and Mr. Larry Baresel. The out-of-area loans authorized by Mr. Hudson depleted the bank's liquidity to the point that it was borrowing federal funds and unable to service its own customers. The loans in question were made contrary to the bank's written loan policy.

not whether its operation resulted in an unjustified forfeiture or was unconscionable. Based on this hearing as well as the briefs of both sides, the district court first concluded that Section 12 is not ambiguous by itself or when read together with the other notice provisions and the rest of the bond. The court also found the termination consequences in Section 12 override the normal notice requirements of Section 5.

Additionally, the court found that the underlying purpose of Section 12 is to protect the insurer from the additional risk of claims where receivers of a failed bank file a multitude of lawsuits to obtain additional funds to pour into the receivership. The court found that by choosing the type of risk it was willing to undertake, the insurer does not cause an unjustified forfeiture. Furthermore, the court found the parties made time of the essence and therefore the insured bank must comply with the required notice. The court also found KBS did present a claim of prejudice.

The FDIC appeals and asserts: (1) enforcement of the last paragraph of Section 12 violates public policy; and (2) even if the last paragraph of Section 12 were enforceable, the Banks substantially complied with that provision and KBS did not make the requisite showing of prejudice suffered as a result of untimely notice.

■ The issues decided by the district court in its hearing were first presented to the court on KBS's Motion for Summary Judgment. The district court struck the motion for failure to comply with local rules. KBS filed a motion for reconsideration which the district court ultimately denied. Both parties agreed to bifurcate the issues for trial. Before a trial to the jury, the court heard argument on the basis of stipulated facts as to the applicability of Section 12 as a bar to the FDIC's claim. At the hearing, the court characterized the proceeding as a "quasi summary judgment motion." In its written order, however, the

court referred to the hearing as a trial. Whether we characterize the proceeding as a summary judgment hearing or a bench trial does not affect our standard of review. In effect, the court made solely legal determinations based on stipulated facts. We review de novo the district court's legal conclusions. *In re Thompson*, 894 F.2d 1227, 1228 (10th Cir.1990); *Bill's Coal Co. v. Board of Pub. Utils.*, 887 F.2d 242, 244 (10th Cir.1989).

## II. PUBLIC POLICY

■ The FDIC asks us to conclude the last paragraph of Section 12 of the insurance bonds is unenforceable as violative of public policy. The contested language in Section 12 states:

> After termination or cancelation, no ... Federal official ... acting in the capacity of receiver ... shall have or exercise any right to make any claim against [KBS], unless Proof of Loss, duly sworn to, with full particulars and complete documentation has been received by [KBS] prior to the termination or cancelation of this bond.

The FDIC contends enforcement of this provision violates public policy because it deprives the FDIC of the Banks' right to collect on claims covered by the bonds and interferes with the FDIC's ability to carry out their statutory duties. The FDIC also argues the Financial Institutions Reform, Recovery and Enforcement Act of 1989 (FIRREA), Pub.L. No. 101–73, 103 Stat. 183 (Aug. 9, 1989), does not express a public policy favoring enforcement of the provision.[4]

The FDIC did not argue to the district court that Section 12 as written is a nullity purely because of public policy considerations. Instead, it based its argument on impossibility, unconscionability, unjustified forfeiture, and the insured's duty to show prejudice from lack of compliance. The FDIC stated to the district court, "We are

---

**4.** Even assuming the FDIC is correct on this point, this argument does not warrant reversal of the district court's decision. Several bases existed to support the district court's judgment.

Even if the court's conclusion as to FIRREA were incorrect, enough additional support exists to uphold its judgment.

not simply trying to zap Section 12 as saying you can never do that kind of thing."

Now the FDIC is asking us to "zap Section 12" because it violates public policy. We will not reverse a district court's judgment on the basis of issues raised for the first time on appeal. *Petrini v. Howard*, 918 F.2d 1482, 1483 n. 4 (10th Cir.1990). If the FDIC did not present the question of whether public policy disallows the enforcement of Section 12 to the district court "[the question] is not properly before us." *Hokansen v. United States*, 868 F.2d 372, 378 (10th Cir.1989).

Based on our review of the record, we conclude this question was not properly presented to the district court. *See Hokansen*, 868 F.2d at 378. (We held an issue was not properly preserved or presented where plaintiffs expressly avoided basing their claim on the issue they attempted to raise on appeal.) Even when the district court raised the question of public policy, the FDIC expressly disavowed that it was proceeding on that theory. Questioning by the district court itself on the applicability of public policy is insufficient to preserve the issue for appeal. In a similar case, the *Hokansen* court concluded that the theory being raised to the appellate court was inappropriate even though the district court had discussed the theory in its order where it did so only to distinguish the theory from the one the plaintiff did raise and to point out the plaintiff had failed to put the theory in issue. *Id.* The district court acted similarly here. The judge noted he did not see any public policy argument raised by the FDIC. He then stated, "Have I overlooked something in your brief, FDIC?" The FDIC merely reiterated its arguments and replied that "depending upon how you interpret the argument, or imply the argument, perhaps, 'public policy,' the answer is either 'yes' or 'no.'" We think the answer is no. We decline to allow the FDIC to change its position between the district court and its appeal with respect to a public policy argument. We hold the FDIC did not properly present to the district court the public policy argument it wants us to review. We will not consider this issue for the first time on appeal.

The FDIC asserts that even if it did not properly preserve and present its public policy argument to the district court, we are empowered to raise the issue *sua sponte*. We do not wish to invoke this power.

### III. SUBSTANTIAL COMPLIANCE AND PREJUDICE

In response to KBS's motion to dismiss in district court, the FDIC argued that if the last paragraph of Section 12 is enforceable, the Banks' substantially complied with its provisions and therefore the Banks' claims should not be dismissed. Specifically, the FDIC alleged the Banks' loss letters sent to KBS were sufficient and timely proofs of loss. The district court did not address whether the Banks substantially complied with the notice provisions of Section 12. The court found Section 12 was unambiguous and time was of the essence in the insurance contract. Consequently, as the FDIC admitted that it could not present any evidence that KBS received the loss letters prior to the time the bonds terminated, the court dismissed the case. Additionally, the court found that if it followed the FDIC's analysis, KBS would be prejudiced by being "stuck with the very risk it so carefully sought to avoid when it drafted Section 12."

The FDIC asserts the district court erred by failing to recognize the doctrine of substantial compliance and by failing to require KBS to show it suffered prejudice from delayed notice receipt. KBS asserts the trial court did not err. Essentially, KBS argues that substantial compliance is not sufficient because under Oklahoma law, filing a proof of loss is a condition precedent to liability for a fidelity bond. Furthermore, KBS asserts it was not required to show prejudice. Alternatively, KBS alleges the district judge correctly found that KBS did suffer prejudice as a result of late notice receipt.

Federal law governs suits brought by the FDIC. 12 U.S.C. § 1819. In applying federal law in this case, we

have an option: we may utilize federal laws or we draw on the law of the state involved—Oklahoma. *FDIC v. Bank of San Francisco*, 817 F.2d 1395, 1398 (9th Cir. 1987). "Whether to adopt state law or fashion a nationwide federal rule is a matter of judicial policy." *United States v. Kimbell Foods Inc.*, 440 U.S. 715, 728, 99 S.Ct. 1448, 1458, 59 L.Ed.2d 711 (1979). Where no applicable federal common law exists, we apply a presumption that state law is adequate. *FDIC v. Braemoor Assocs.*, 686 F.2d 550, 554 (7th Cir.1982), *cert. denied*, 461 U.S. 927, 103 S.Ct. 2086, 77 L.Ed.2d 297 (1983). Thus, when the FDIC is suing as an assignee of the Banks' cause of action, as here, state law is very helpful. *See id.* Consequently, we turn to Oklahoma law to aid our de novo review of this case.

■ In Oklahoma, parties to a contract can make time of the essence in that contract if the parties' intent appears clearly in the terms of the contract. *Dillard v. Ceaser*, 206 Okl. 304, 243 P.2d 356, 358 (1952). Oklahoma law does not require any particular phrase or form of words. *Id.* at 356, 243 P.2d 356. In the terms of the insurance contract at issue—Section 12—the parties clearly express a definite time in which to comply with the notice requirements. KBS must receive proof of loss before a receiver takes over the insured bank. The consequences of noncompliance are also clearly defined. If KBS does not receive proof of loss before a receiver takes over the insured bank, the receiver loses any of the insured bank's potential claims.

■ We conclude Section 12 explicitly demonstrates the parties' intent to make time of the essence. Consequently, the FDIC cannot recover as the Banks did not comply with the express time requirement in the notice provision. All the Banks' potential claims were expressly terminated by the terms of Section 12 when KBS did not receive notice prior to the termination of the fidelity bond. Therefore, no claims exist and the FDIC has no basis for recovery. We hold where time is of the essence substantial compliance with a specific time

requirement is insufficient and accordingly the FDIC's claim must fail. We are not free to rewrite the parties' contract.

■ Because we hold time is of the essence for the notice provision of Section 12, the FDIC's argument that KBS must show prejudice to defeat liability also must fail.

Quoting *Dixon v. State Mut. Ins. Co.*, 34 Okl. 624, 126 P. 794, 795 (1912), the FDIC argues that " '[u]nless time was made of the essence of the contract, the [insurer] cannot escape liability for the loss, except it appears that they were injured by the failure of the insured to comply with the letter of the contract as to time for giving notice and making proof.' " *See also Independent School Dist. No. 1 v. Jackson*, 608 P.2d 1153, 1155 (Okla.1980); *Fox v. National Savings Ins. Co.*, 424 P.2d 19, 25 (Okla.1967). The FDIC also quoted *Continental Cas. Co. v. Beaty*, 455 P.2d 684, 688 (Okla.1969), where the court stated that " '[u]nless failure to comply with the provision for notice expressly is made a ground of forfeiture, the insurer cannot avoid liability except for prejudice resulting from the insured's failure to comply with the letter of the contract concerning notice and proof of loss.' " Fundamentally, unless time is of the essence, the insurer must show prejudice resulting from late notice receipt. Here, however, time is of the essence. Therefore, prejudice need not be shown where an insured fails to comply with an express notice requirement.

Where time is of the essence in a contract, the parties have bargained for strict compliance with specific time requirements. Consequently, the parties inherently are prejudiced by noncompliance. No additional prejudice need be shown. Therefore, we hold KBS is not required to show prejudice suffered as a result of late notice receipt.

## IV. CONCLUSION

Because the FDIC's public policy argument is not properly before us we decline to consider it. Furthermore, we conclude Section 12 of the fidelity bonds evidences an intent to make time of the essence re-

garding notice. Consequently, substantial compliance with the notice provision is insufficient and KBS is not required to show prejudice suffered as a result of the Banks' noncompliance with the notice provision. Therefore, the district court's order dismissing the FDIC's claim is AFFIRMED.