In the
United States Court of Appeals
For the Seventh Circuit

No. 01-1611

ELDA ARNHOLD and BYZANTIO, L.L.C.,

Plaintiffs-Appellees,

v.

OCEAN ATLANTIC WOODLAND CORPORATION,

Defendant-Appellant.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 99 C 7953--Arlander Keys, Magistrate Judge.

Argued SEPTEMBER 26, 2001--Decided March 21, 2002


   Before FLAUM, Chief Judge, and COFFEY and
MANION, Circuit Judges.

   COFFEY, Circuit Judge.  Ocean Atlantic
Woodland Corporation ("the Buyers" or
"Ocean Atlantic") entered into a final
settlement agreement with Elda Arnhold
and Byzantio, L.L.C. ("the Sellers")
concerning the sale of farmland in Will
County, Illinois. The agreement contained
a "time-essence" clause that required the
parties to close on the property no later
than January 25, 2001./1 Ocean Atlantic
failed to meet the closing deadline but
nevertheless moved to enforce the
agreement and obtain specific performance
of the contract. After a two-day
evidentiary hearing, the magistrate judge
denied the motion, finding that Ocean
Atlantic had lost its rights to the
property and declaring the contract
terminated. 132 F. Supp.2d 662. We
affirm.

I.   INTRODUCTION

"What a diff'rence a day makes . . .
twenty-four
little hours."/2
   This case concerns Ocean Atlantic's
inability to close on a real estate
transaction until one day after the
deadline imposed by a clear and
unambiguous "time-essence" clause that
was thoroughly negotiated and viewed by

the parties as a material term of their contract. At the heart of this controversy is paragraph 15 of the contract, which contains what the parties typically refer to as "the drop-dead clause." The clause provides as follows:

It is intended by Sellers and Purchasers that January 25, 2001 shall be the absolute final date for closing . . . . If closing has not occurred on or before January 25, 2001, for any reason other than Sellers' default . . . Purchaser shall have no right to purchase or otherwise encumber the Property or Homestead parcel, the Contract shall be terminated, and Purchaser shall have no rights with respect to the Property or Homestead Parcel.

Based upon our review of the record, we agree with the district court's finding that the parties clearly intended to end their acrimonious three-year relationship--which had resulted in two previous federal lawsuits and three extensions in the closing date--one way or another, no later than January 25, 2001. The magistrate judge properly found that Ocean Atlantic assumed the risk of losing title to the property if it failed to close, for any reason, by that specific date. Thus, the Sellers were entitled to terminate the contract on January 26, 2001--one day after their offer to sell the property expired.

II. FACTUAL BACKGROUND

A. August 6, 1997 to October 26, 2000

The Sellers, Edith Arnhold and John Argoudelis, are lifelong farmers who own 280 acres of land near Plainfield, Ill., a far southwestern suburb of Chicago that is presently regarded as one of the fastest growing areas in the state. In exchange for $7.56 million payable over three years, the Sellers agreed on August 6, 1997 to sell their farm to Ocean Atlantic, a sophisticated development corporation that planned to transform the land into a residential subdivision with more than 700 homes. The parties scheduled the initial closing on November 15, 1997 and agreed to cooperate and ensure that all the conditions precedent to initial closing--such as the rezoning and annexation of the land by the Plainfield Village Board--would be met in

a timely manner.

Despite their best efforts, however, the parties realized that they were in no position to meet the November 15, 1997 deadline, for they had neither executed the necessary documents nor obtained the Board's approval of the annexation. At this juncture, the Sellers granted Ocean Atlantic's request to extend the initial closing to January 15, 1999. Thereafter, during the next twelve months, several events occurred that laid the seeds for this present civil action.

1. The Buyers' federal lawsuit

Throughout the spring and summer of 1998, Ocean Atlantic met with local planning officials to discuss their proposed development involving the Sellers' land. However, by the fall, Ocean Atlantic still had not presented the Board with a petition for annexation of the property. The Sellers accused Ocean Atlantic of dragging its feet by refusing to draft a final engineering plan, which, upon approval by the Board, would have triggered a mandatory closing date within thirty days. The Sellers also expressed frustration over Ocean Atlantic's repeated proposals to renegotiate the purchase price of the land. The Sellers, therefore, retaliated by refusing to execute any annexation petition unless Ocean Atlantic accelerated the first closing date to December 31, 1998. The parties continued to meet regularly in the hopes of resolving this standoff, but with neither side budging, it appeared unlikely that the property would be sold on time.

In the midst of these bargaining sessions, unbeknownst to the Sellers, Ocean Atlantic filed a federal lawsuit in November 1998, asking the court to order the Sellers to sign the requisite annexation petition. The Sellers, on their own accord, did execute the document on December 1, 1998, thereby providing Ocean Atlantic with the relief it sought in its lawsuit and thus removing the final impediment to the property's annexation over which the Sellers had any control. Nevertheless, for reasons not explained in the record, Ocean Atlantic proceeded to serve the Sellers in January 1999 with their now moot lawsuit for specific performance. Three months later, Ocean Atlantic

voluntarily dismissed its suit and dropped its demand for a price reduction. The parties subsequently agreed to a second extension of the contract, which pushed back the initial date of closing to November 30, 1999. Significantly, the Sellers thereafter notified Ocean Atlantic on numerous occasions that they would consider the contract terminated if the closing failed to occur by that date. According to one of the sellers, John Argoudelis, "We made the decision, probably in 1998 or 1999, after we got sued for the first time, that we were not enamored with Ocean Atlantic and it was not our intention to have any more relationship with them than what we were contractually obligated to have."

2.  The Sellers' federal lawsuit

   Seemingly oblivious to the November 30 deadline looming overhead, Ocean Atlantic sought to delay the initial closing for a third time. In early November, Ocean Atlantic claimed that it was entitled to another extension, based on a clause in the contract allowing for a minimum 45-day postponement of the closing date if the Board failed to issue sewer permits for the property. Ocean Atlantic asserted that the village had imposed a moratorium on such permits because its sewer plant was operating at total capacity. The Sellers, however, obtained information from village officials leading them to believe that permits were available but that Ocean Atlantic deliberately failed to obtain them. The Sellers further contended that Ocean Atlantic invoked the moratorium clause merely as a pretext for delay, in order to capitalize on the Sellers' desire to close quickly and, once again, attempt to force them to agree to a price reduction. It appears that Ocean Atlantic's lenders agreed to finance the deal on the assumption that other developers would be building expensive homes in the surrounding area. When these developments were scaled back, Ocean Atlantic and its lenders became concerned that the value of the Sellers' property also would decline; this caused the lenders to insist on more costly guarantees that were eating into Ocean Atlantic's anticipated profit margin. The Sellers believed that Ocean Atlantic's president, Michael Ferraguto, was trying to defray his added costs by forcing the Sellers to accept less for their

property. Specifically, by threatening to hold up the closing and bring a second lawsuit, Ferraguto hoped to pressure the Sellers into accepting a $1 million price reduction instead of walking away from the contract, inviting litigation, and running the risk of paying damages if they were saddled with a judgment against them./3

In response to Ocean Atlantic's vexatious conduct, the Sellers filed a federal lawsuit November 22, 1999, seeking a declaratory judgment that the contract would be terminated if the closing did not occur by November 30, 1999. The lawsuit--which was now the second civil action involving the property--moved rather slowly. It was not until September 26, 2000 that the district judge ruled on the Sellers' motion for summary judgment. The court denied the motion and set the trial for October 30, 2000, finding that there were genuine factual disputes concerningwhether the Village of Plainfield had, in fact, imposed a moratorium on sewer permits and thereby extended the closing date. Rather than proceed to trial, the Sellers and Ocean Atlantic entered into serious negotiations, and on October 26, 2000, they signed the settlement agreement containing the time-essence clause that is the basis of this lawsuit. The Sellers thereafter dismissed their lawsuit with prejudice and agreed for the third time to postpone the closing. The new date was scheduled for January 25, 2001.

B.  October 26, 2000 to January 25, 2001

1.  Final negotiations and material terms

Throughout the negotiations preceding the settlement agreement, the Sellers insisted upon a rigid, absolute closing date. Indeed, three days before Ocean Atlantic signed the agreement, the Sellers' attorneys stressed that an essential and material part of the bargain had to be that, "If Ocean Atlantic, for any reason whatsoever, fails to close on the property within 90 days from the execution of [the] settlement document, it shall forfeit any and all rights it may have to purchase the property." Ocean Atlantic's attorney acknowledged that negotiations would fail

unless his client agreed to: (1) "a closing date or dates without the possibility of extensions or delays"; and (2) "the absolute right of [the Sellers] to terminate the contract in the event of a failure to close on the set closing date(s)." Ocean Atlantic further emphasized its understanding of the importance of these terms in the same signed letter, stating, "Ocean Atlantic will agree that failure to close . . . shall result in Plaintiff's unequivocal right to terminate the contract." After reviewing this and other evidence in the record before him, the trial judge found that "a final 'drop-dead' closing date [was] an integral part of any final settlement agreement."

The district court specifically concluded that there were three material provisions in the settlement agreement. First, the parties unequivocally agreed to close and transfer the funds and the property on one fixed date, January 25, 2001, rather than on three separate dates, as they had originally planned. Second, the parties agreed that January 25, 2001 would be an absolute, final date for closing. Third, the Sellers agreed to waive any future litigation over the sewer moratorium. With respect to the time-essence clause, the trial judge found that "[the Sellers] wanted the certainty that by one particular date (in this case, January 25, 2001) either a closing would occur, or the contract would be terminated." 132 F. Supp.2d at 665-66. Underscoring the importance of the drop-dead closing clause, the trial court found that the Sellers "would never have dismissed their lawsuit with prejudice, and entered into the Settlement Agreement if paragraph 15-- providing for a final, absolute closing date--had not been included" and agreed upon. Id. at 671.

2. The drop-dead date

Ocean Atlantic had the right to schedule the closing on any of the ninety-one days between October 26, 2000 and January 25, 2001. Nevertheless, it exercised that right by informing the Sellers that it had chosen to close January 24--a mere one day prior to the drop-dead date.

In keeping with what was an unseemly yet now-familiar pattern of delay, Ocean

Atlantic's words were betrayed by its actions. On January 18, Ocean Atlantic sent the Sellers a letter demanding that they move the closing to May 1 and pay an additional $680,000 in development fees. These fees had never been the subject of any prior negotiations nor were they embodied in any prior agreement between the parties. The Sellers rejected Ocean Atlantic's demand-- which the trial judge described as an attempt "to extort nearly 10% of the purchase price on the eve of closing"--and warned that "[i]f the closing does not occur in accordance with the terms of the settlement agreement, your clients will have no rights whatsoever to the property after January 25, 2001, as clearly spelled out in that same agreement." At this point, Ocean Atlantic withdrew its proposals and thereafter assured the Sellers that it would "fully participate in the scheduled closing [January 24], pursuant to the settlement agreement."

Sadly, this assurance proved worthless. The Sellers arrived for the closing at the offices of a local trust company on the morning of January 24. The Sellers executed each and every document, and, according to the district court, "were entirely willing and able to close" that day. However, closing failed to occur on either January 24 (the date selected by Ocean Atlantic) or January 25 (the absolute, final drop-dead date in the Settlement Agreement) because Ocean Atlantic failed to tender the purchase price of $7.267 million for deposit into the Sellers' escrow account. Ocean Atlantic's chosen lender--Yorkville National Bank--refused to release the money until: (1) Ocean Atlantic provided the bank with a written loan guarantee from Ocean Atlantic's equity investment partner, the New York-based Black Acre Capital Group; and (2) Black Acre tendered to the bank a copy of Black Acre's corporate resolution, along with an opinion from its legal counsel, stating that it is authorized to issue such guarantees. The attorneys representing Ocean Atlantic and Black Acre failed to deliver the documents to the bank until sometime in the afternoon of January 26-- one day after the drop-dead date provided for in the contract.

Several hours before the documents reached the bank, the Sellers' attorneys

notified Ocean Atlantic that the contract was terminated. After receiving this notice, Ocean Atlantic pleaded with the Sellers to go forward with the sale, but the Sellers refused and this lawsuit followed. Ocean Atlantic sought specific performance of the contract, and the Sellers asked the district court to rule that the contract was null and void. The district court held a two-day evidentiary hearing and concluded that Ocean Atlantic's failure to close by the date specified in the contract was a material breach of the agreement. Furthermore, the court found that the agreement "has been properly terminated, pursuant to its terms," and that "Ocean Atlantic has no rights with respect to the Property at issue in the case sub judice." We are now presented with Ocean Atlantic's appeal.

III.  STANDARD OF REVIEW

We review the district court's legal conclusions de novo. We review its application of law to fact and its factual findings for clear error. American Suzuki Motor Corp. v. Bill Kummer Inc., 65 F.3d 1381, 1385 (7th Cir. 1995). We give "due regard . . . to the opportunity of the trial court to judge the credibility of the witnesses," Lange v. United States, 31 F.3d 535, 539 (7th Cir. 1994), and when there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous. Anderson v. Bessemer City, 470 U.S. 564, 574 (1985).

IV.  DISCUSSION

The only issue before us is whether Ocean Atlantic materially breached the Settlement Agreement by failing to tender $7.267 million and close on the property by January 25, 2001. We are convinced that the magistrate judge, acting as a factfinder applying Illinois law, could have reasonably determined that Ocean Atlantic's inability to comply with the drop-dead clause until January 26, 2001 constituted a material breach, thereby absolving the Sellers of all their duties under the contract. Therefore, based upon our review of the evidence presented at trial, we affirm the judgment of the district court.

A.  The Two-Step Materiality Inquiry

"Parties to a contract may make 'time is of the essence' a provision of the contract," meaning that performance by one party at the time or within the time frame specified in the contract is essential to enable him to require counterperformance by the other party. Maywood Proviso St. Bank v. York St. Bank & Trust Co., 252 Ill.App.3d 164, 169 (1st Dist. 1993). Timely performance often is an absolute requirement even if the contract does not contain the talismanic phrase "time is of the essence"; it is well-settled that "the intention of the parties as expressed by the agreement controls," Will v. Will Prods. Inc., 109 Ill.App.3d 778, 782 (2d Dist. 1982), and courts "will give effect to this provision when no peculiar circumstances have intervened to prevent or excuse strict compliance." Maywood, 252 Ill.App.3d at 169 (citing Hart v. Lyons, 106 Ill.App.3d 803, 805 (2d Dist. 1982)).

A party that fails to perform its contractual duties is liable for breach of contract, and a material breach of the terms of the contract will serve to excuse the other party from its duty of counterperformance. Finch v. Illinois Cmty. Coll. Bd., 315 Ill.App.3d 831, 836 (5th Dist. 2000); Circle Sec. Agency Inc. v. Ross, 107 Ill.App.3d 195, 202-03 (1st Dist. 1982). In determining whether a breach is material, some Illinois courts have stated that the question is whether performance of the disputed provision was the "sine qua non of the agreement," i.e., "of such a nature and such importance that the contract would not have been made without it." Arrow Master Inc. v. Unique Forming Ltd., 12 F.3d 709, 715 (7th Cir. 1993); Dragon Constr. Inc. v. Parkway Bank & Trust, 287 Ill.App.3d 29, 33 (1st Dist. 1997); Newton v. Aitken, 260 Ill.App.3d 717, 719 (2d Dist. 1994). Other courts have stated that the question of "whether a breach is material, thereby discharging the other party's duty to perform, is based on the inherent justice of the matter." Kel-Keef Enters. Inc. v. Quality Components Corp., 316 Ill.App.3d 998, 1016 (1st Dist. 2000); Francorp Inc. v. Siebert, 126 F. Supp.2d 543, 547 (N.D. Ill. 2000); Rogers v. Balsley, 240 Ill.App.3d 1005, 1011 (2d Dist. 1993).

We are convinced that these cases demonstrate that, under Illinois law, the

materiality inquiry focuses on two interrelated issues: (1) the intent of the parties with respect to the disputed provision; and (2) the equitable factors and circumstances surrounding the breach of the provision. See, e.g., Maywood Proviso, 252 Ill.App.3d at 169 (citing Cantrell v. Kruck, 25 Ill.App.3d 1060, 1064 (2d Dist. 1975)); Krentz v. Johnson, 36 Ill.App.3d 142, 144-46 (2d Dist. 1976). When analyzing the materiality of a time-essence clause, the factfinder initially must ask whether performance by a particular date was truly of such significance that the contract would not have been made if the provision had not been included. A negative answer to this initial question means that the clause did not meet the materiality test and that the breach was minor, provided that the party has completed performance within a reasonable period of time. Intervisual Communications Inc. v. Volkert, 975 F. Supp. 1092, 1101 n.17 (N.D. Ill. 1997); Omni Partners v. Down, 246 Ill.App.3d 57, 63 (2d Dist. 1993). On the other hand, an affirmative answer to the first question does not end the materiality inquiry. As we stated in our seminal case of Sahadi v. Continental Illinois National Bank, "even where the parties clearly intended to regard a specific payment date as crucial, 'equity will refuse to enforce such a provision when to do so would be unconscionable or would give one party an unfair advantage over the other.'" 706 F.2d 193, 197 (7th Cir. 1983) (quoting Janssen Bros. Inc. v. Northbrook Trust & Sav. Bank, 12 Ill.App.3d 840, 844 (2d Dist. 1973)). As a result, even if the factfinder concludes that timely performance is an essential element of the contract, he or she must also decide whether to award damages and require counterperformance in spite of the breach. See 8 Corbin on Contracts sec. 37.3 (2000) ("Equity limits our power to determine our own contractual rights and obligations.").

The factfinder must take into account the totality of the circumstances and focus on the inherent justice of the mat ter. This analysis "may not be made through a mechanical process," Sahadi, 706 F.2d at 198, and case law makes clear that it is impossible to provide an exhaustive, dispositive checklist of factors for the trier of fact to consider in every situation. See id.; Restatement

(Second) of Contracts sec. 241 cmt. a (1981). However, at a minimum, the focus should be on factors such as: whether the breach defeated the bargained-for objective of the parties; whether the non-breaching party suffered disproportionate prejudice; and whether undue economic inefficiency and waste, or an unreasonable or unfair advantage would inure to the non-breaching party./4 Arrow Master, 12 F.3d at 715; Sahadi, 706 F.2d at 196; Regan v. Garfield Ridge Trust & Sav. Bank, 220 Ill.App.3d 1078 (2d Dist. 1991); Chariot Holdings Ltd. v. Eastmet Corp., 153 Ill.App.3d 50 (1st Dist. 1987); O'Malley v. Cummings, 86 Ill.App.2d 846 (1st Dist. 1967). We review the district court's analysis of these factors below.

1.   Step one: Intent of the parties

   As noted previously, paragraph 15 of the settlement agreement states:

It is intended by Sellers and Purchasers that January 25, 2001 shall be the absolute final date for closing . . . . If closing has not occurred on or before January 25, 2001, for any reason other than Sellers' default . . . Purchaser shall have no right to purchase or otherwise encumber the Property or Homestead parcel, the Contract shall be terminated, and Purchaser shall have no rights with respect to the Property or Homestead Parcel.

The magistrate judge found that this clause was "an essential (if not 'the' essential) term of the Settlement Agreement," and we agree.

   In Illinois, the "primary object in construing a contract is to give effect to the intention of the parties." Arrow Master, 12 F.3d at 713. The extent to which a time-essence clause should be strictly enforced "depends upon the parties' intentions, which are to be determined both by the language used in the agreement and the circumstances surrounding the agreement." Anest v. Bailey, 198 Ill.App.3d 740, 746 (2d Dist. 1990). When considering extrinsic evidence, the factfinder should focus, in descending order of importance, on: (1) the parties' negotiations over the contract at issue; (2) their course of performance; (3) their prior course of

dealing; and (4) trade usage in the relevant industry. See, e.g., Reynolds v. Roberts, 202 F.3d 1303, 1316 (11th Cir. 2000); Den Norske Bank AS v. First Nat'l Bank of Boston, 75 F.3d 49, 52-53 (1st Cir. 1996).

In the case before us, the district court considered the language of the settlement agreement, along with the substance of the parties' negotiations and their course of performance prior to January 26, 2001./5 All three categories of evidence support a finding of materiality. The explicit and unequivocal language of the contract is an unambiguous expression of intent, referring to January 25, 2001 as an "absolute, final date for closing" that "shall" be enforced without exception. These contract terms were chosen with precision after extensive negotiations during which Ocean Atlantic conceded, in its own words, "that failure to close . . . shall result in Plaintiffs' unequivocal right to terminate the contract." Extrinsic evidence establishing the bitterness of the parties' protracted relationship also supports the magistrate's finding that the parties intended strict adherence to the January 25, 2001 closing date. The record reflects that the initial contract contemplated closing in November 1997, and nearly three years had passed without reaching that objective. Thus, by the time the most recent settlement agreement was drafted, the Sellers testified that their heart was no longer in selling their property to Ocean Atlantic, and Ocean Atlantic's president similarly testified that he was "sick and tired" of dealing with the Sellers./6

We are convinced that the settlement agreement reflects a compromise. The Sellers agreed to continue their relationship through January 25, 2001 and give Ocean Atlantic one last, final chance to comply with the language of the contract and purchase the farmland. In exchange, Ocean Atlantic agreed that absolutely no further delays would be tolerated. In light of the testimony that the Sellers would not have signed the settlement agreement unless it contained the drop-dead clause, as well as myriad additional evidence referred to in the trial judge's opinion, we agree with the district court's conclusion that the

clause was a material term of the contract. Mayfair Constr. Co. v. Waveland Assocs., 249 Ill.App.3d 188, 202 (1st Dist. 1993).

We see no merit to Ocean Atlantic's assertion that, "although the Sellers vigorously contend that they would have never entered into the Settlement Agreement without the inclusion of the drop-dead clause," the Sellers "would have entered into the Settlement Agreement if the language of the clause had been slightly altered to make January 26 (or any other reasonable date) the outside closing date." (Br. at 38.) Ocean Atlantic supports this claim with Argoudelis's testimony during cross-examination that the Sellers: (1) were seeking to close "fairly quickly" after October 26, 2000; (2) readily agreed to Ocean Atlantic's offer to set the closing date for January 25, 2001 or before; and (3) "probably would have agreed" to close on January 26, 2001 if Ocean Atlantic had suggested this date, and it had been the drop-dead date provided for in the contract instead of January 25. Ocean Atlantic concludes from this evidence that "closing on January 25, 2001 was not the sine qua non of the settlement agreement." (Id.)

Ocean Atlantic's flaccid argument denigrates the fundamental value of the drop-dead clause: finality. The Sellers granted Ocean Atlantic the right to propose any given closing date within several months of October 25. However, when the Sellers accepted the offer to close January 25, they did so with the understanding that this date was final. Thus, this date became a material term of the contract because it established the definite and fixed moment after which the parties' mutual rights, responsibilities, and relationship would terminate-- something the Sellers had been seeking to accomplish for almost three years. It is of no consequence that the Sellers allowed Ocean Atlantic to pick the precise final closing date and stated that they would have accepted payment on some date other than January 25 if that date had been selected by Ocean Atlantic and accepted by both parties in the first instance. Argoudelis gave clear, convincing, and undisputed testimony that "once the date [January 25] was selected . . . that particular date held

significance" because it was a rigid deadline that "could not be violated" instead of some approximation of a reasonably elastic date. Ocean Atlantic points us to no evidence demonstrating that the Sellers were willing to accept payment after January 25, once that date was offered and accepted as the final date for performance. The trial judge expressly credited Argoudelis's testimony, and we reject Ocean Atlantic's argument that the trial judge's finding was clearly erroneous./7 Freeman United Coal Mining Co. v. Sum-mers, 272 F.3d 473, 480 (7th Cir. 2001) ("one cannot rationally ignore credible, uncontested evidence"); Central St. S.E. & S.W. Areas Pension Fund v. Koder, 969 F.2d 451, 454-55 (7th Cir. 1992).

2. Step two: Totality of the circumstances

Having concluded that time was of the essence, we must next consider whether the trial court erred in finding that Ocean Atlantic committed a material breach by failing to meet all of the requirements for closing until January 26, 2001--one day after the drop-dead date in the contract.

We emphasized ante at 12-13 that even when the parties agree to make timely performance an essential element of the contract, the factfinder must also consider whether the breach was material as to justify the other party's subsequent refusal to perform, based upon the totality of the circumstances. Although the majority of the magistrate judge's opinion focused on the language of the drop-dead clause and the intent of the parties when entering into it, 132 F. Supp.2d at 663-72, the judge also dealt with the overall nature of the breach in light of several countervailing equitable factors. Id. at 672-74. In the latter portion of his opinion, the judge carefully explained why these factors fail to justify preserving the contract and found that Ocean Atlantic committed a material breach even after considering such factors. Id.

Thus, we are convinced that the magistrate properly applied the law and reached findings of fact that are reasonably supported in the record. Accordingly, we hold that Illinois law

permits a finding of material breach based upon Ocean Atlantic's one-day delay in performance. See Chariot Holdings, 153 Ill.App.3d at 58-59 (distinguishing on the facts yet approvingly citing Schneider v. Dumbarton Devs. Inc., 767 F.2d 1007 (D.C. Cir. 1985), which affirmed a finding of material breach based on a one-day delay in a real estate transaction); John H. Scheid, Buying Blackacre, 23 J. Marshall L. Rev. 15, 59 (1989) (If time is of the essence, "Illinois courts, tending to be strict constructionists, will enforce the clause and hold that a delay of one day is a material breach."); 12A Illinois Law & Practice sec.sec. 303-05 (1983 & Supp. 2001); see also Hardin Rodriguez & Boivin v. Paradigm Ins. Co., 962 F.2d 628, 637 (7th Cir. 1992) (Doctrine of substantial performance "[does] not extend to cases like the one before us, where the plaintiff insisted upon strict compliance with its conditions and has never waived them."). Our holding is consistent with those from other jurisdictions that have found material breaches in cases that are analogous to the one before us. See FDIC v. Kansas Bankers Sur. Co., 963 F.2d 289 (10th Cir. 1992); Schneider, 767 F.2d 1007; Sun Bank of Miami v. Lester, 404 So.2d 141 (Fla. App. Ct. 1981); see also Jacob & Youngs Inc. v. Kent, 129 N.E. 889, 891 (N.Y. 1921) (Cardozo, J.) (the parties are "free by apt and certain words to effectuate a purpose that performance of every term shall be a con dition of recovery"); Brady v. Oliver, 147 S.W. 1135, 1140 (Tenn. 1911) ("A case can be conceived where a default of one day might defeat the whole purpose of the contract."); 15 Williston on Contracts sec. 44:53 at 225 (2000) ("A typical example of a clause requiring strict compliance is one making time of the essence of the contract; substantial, although late, performance is not generally sufficient. . . .").

b. The relevant factors

i. Bargained-for objective

   Ocean Atlantic disputes the court's finding that the failure to close by January 25, 2001 defeated the bargained-for objective of the contract. Ocean Atlantic contends that "the general objective of the Settlement Agreement was to effectuate the sale of the property."

In Ocean Atlantic's view, "termination of the Settlement Agreement was never a bargained-for objective of either party, but rather a potential consequence if the bargained-for objective was not met." (Br. at 16-17.) We cannot accept this unduly narrow reading of the agreement in this case.

Illinois courts construe contract terms "so as to avoid rendering other terms redundant or meaningless." Carroll v. Acme-Cleveland Corp., 955 F.2d 1107, 1112 (7th Cir. 1992). "[W]here a contract does not set a closing date and time is not made of the essence, the law will imply that the contract is to be performed within a reasonable time." Omni Partners, 246 Ill.App.3d at 63. Thus, a material time-essence provision indicates that substantial but incomplete performance is not the central objective of the contract. Rather, the deal must be done on time if it may be done at all.

By enforcing such provisions, courts avoid substituting their judgment for those of sophisticated parties and concomitantly extinguishing the parties' legitimate expectations in freedom of contract as well as freedom from contract. See, e.g., Venture Assoc. Corp. v. Zenith Data Sys. Corp., 96 F.3d 275, 281 (7th Cir. 1996) (Cudahy, J., concurring) ("Freedom not to contract should be protected as stringently as freedom to contract."). The trial judge in this case concluded that a material, bargained-for objective of the contract was to establish an absolute date beyond which the parties' obligations to each other would terminate, either by the sale of the property or by the passage of time. This finding was supported by ample evidence, including seller John Argoudelis's statements that we quoted and discussed in Part IV.A.1 to the effect that "we bargained for . . . we wanted finality. We wanted a date whereby our relationship with Ocean Atlantic would end, one way or the other."

When Ocean Atlantic failed to pay the Sellers any money and failed to take title to the property by January 25, 2001, it deprived the Sellers of the finality for which they had bargained. This breach went to the very heart and substance of the contract. It was material; indeed, it is difficult to

imagine anything more material, given nearly three years of delays, three contract extensions, and two federal lawsuits involving the sale of this very property. The Sellers displayed the patience of Job by waiting nearly 3 years to accomplish the sale of farmland that was originally intended to be transferred within six months. Paragraph 15 of the settlement agreement clearly called for closing or termination "[i]f closing has not occurred on or before January 25, 2001, for any reason," and the closing failed to occur in a timely fashion. Based on the facts before us, we do not perceive any clear error with the district court's findings. See O'Malley, 86 Ill.App.2d at 451 (holding that explicit deadline, coupled with forfeiture provision, was sufficient evidence of materiality); Schneider, 767 F.2d at 1014 ("The parties bargained for the strict construction that Schneider urges and it would be improper for the courts to put any other interpretation on the 'time is of the essence' clause.").

ii.  Proportionality of prejudice

Ocean Atlantic also asserts that the trial judge mistakenly determined that Ocean Atlantic only "arguably"--rather than "substantially"--suffered greater prejudice than the Sellers as a result of its breach of contract. (Br. at 22-26.) We decline Ocean Atlantic's none-too-subtle invitation to reweigh the facts and revisit the trial court's findings.

The proportionality-of-prejudice element of the materiality test requires the factfinder to compare the relative burdens that each side would suffer if the contract were terminated. McBride v. Pennant Supply Corp., 253 Ill.App.3d 363, 368 (5th Dist. 1993); Maywood Proviso, 252 Ill.App.3d at 169-70; see also Markhoff-Fitzgerald Assocs. v. Sable Corp., 1990 U.S. Dist. LEXIS 2875 *22-25 (N.D. Ill. 1990) (finding immateriality as matter of law; breach of option-to-purchase-insurance clause failed to defeat bargained-for objective and disparity of prejudice was significant).

In the case before us, the district court found that Ocean Atlantic spent $1.7 million in fees and expenses related to the annexation, rezoning, planning, preliminary engineering, and marketing of

the property between 1997 and 2001. On the other hand, because the Sellers testified that they would have placed the funds in a non-interest bearing account if they had been transferred one-day earlier, the trial judge concluded that the Sellers were not financially prejudiced by Ocean Atlantic's delay in payment. In arguing that the district court's findings are clearly erroneous, Ocean Atlantic assumes that the disparity of prejudice is calculated in terms of the absolute economic loss suffered by each party as a result of the breach, and that a $1.7 million difference is simply too much. We cannot agree. If we fully accepted Ocean Atlantic's view, then idiosyncratic parties would have the scale tipped against them and would be gravely handicapped in their efforts to obtain the full, objective, bargained-for benefits of their contract. Although the Sellers suffered no consequential damages in this case, Argoudelis testified that they suffered at least nominal damages in the sense that "we were robbed of the benefit of our bargain if the contract is not terminated on that date. That's what we bargained for. Either we close or we terminate."

The question of prejudice is one for the trier of fact, with each case resting upon its own merits. Arrow Master, 12 F.3d at 714; Sahadi, 706 F.2d at 196. We have repeatedly noted that appellate courts do not reweigh the evidence considered by the trier of fact. United States v. Suarez, 225 F.3d 777 (7th Cir. 2000); Merriweather v. Family Dollar Stores of Ind., 103 F.3d 576 (7th Cir. 1996); Lange, 31 F.3d at 539. Ocean Atlantic's million-dollar loss was, admittedly, substantial. However, a reasonable factfinder, believing that promises conditioned upon timely performance should be kept when made, could have determined that the loss was not enough to warrant granting Ocean Atlantic's motion for specific performance. See Kansas Bankers, 963 F.2d at 294 (parties "who have bargained for strict compliance with specific time requirements . . . inherently are prejudiced by noncompliance" with those deadlines); Dove v. Rose Acre Farms Inc., 434 N.E.2d 931 (Ind. App. Ct. 1982); see also Jacob & Youngs, 129 N.E. at 891 (suggesting that eccentric homeowner who insists on using Reading pipe should not

be forced to accept Cohoes pipe that general contractor believes is "just as good"). We refuse to hold that the trial judge committed clear error. Anderson, 470 U.S. at 574.

### iii.  Unreasonable, unfair advantage

In this section, we reject Ocean Atlantic's final argument that the magistrate judge's ruling "allows Plaintiffs to reap an unreasonable and unfair advantage over Ocean Atlantic by retaining the benefits of Ocean Atlantic's development efforts without incurring any of the costs." (Br. at 32.) The record reflects that some, if not most, of the added value of the Sellers' farmland is attributable to natural appreciation from an upswing in the real estate market. In any event, as we explain below, it is neither unreasonable nor unfair for the Sellers to avail themselves of any extent to which Ocean Atlantic's $1.7 million expenditures have improved the value of the Sellers' property.

Under Illinois law, two important factors to consider at this juncture are: (1) whether the breaching party used reasonable efforts to perform its contractual obligations; and (2) whether the parties contemplated that the breaching party would forfeit its contractual rights if it committed the type of breach that is at issue. See, e.g., Spartech Corp. v. Opper, 890 F.2d 949, 955 (7th Cir. 1990) ("A principal purpose of contracts and contract law is to allocate the risk of the unexpected in accordance with the parties' respective preference for or aversion to risk and their ability or inability to prevent the risk from materializing--not to place it always on the promisee."); Restatement (Second) of Contracts sec. 205 cmt. d (1981) (contractual duty of good faith seeks to minimize behavior such as "evasion of the spirit of the bargain, lack of diligence and slacking off"). Neither of these factors favors Ocean Atlantic.

Ocean Atlantic argues that it missed the deadline because it needed an extra day to obtain and prepare certain corporate loan guarantees requested by Yorkville National Bank on the morning of January 25, 2001. Ocean Atlantic tries to excuse its failure to complete the documents

prior to the close of business that day by claiming that it could not foresee that the bank would request such materials and characterizing the bank's actions as commercially unreasonable in the context of a complex, multi-million dollar real estate transaction. The district court expressed "its doubts" about this testimony, however, reasoning that Ocean Atlantic is a sophisticated corporation that dealt with the bank on prior occasions, had been negotiating the loan for several weeks, should have prepared for any possible emergency, and should have been able to broker some type of deal to satisfy the bank's demands without delaying the sale. Ocean Atlantic is represented by a half dozen learned and qualified attorneys from the giant Chicago law firm of Gardner, Carton & Douglas. The magistrate judge recognized that Ocean Atlantic could have avoided forfeiture or obtained restitution for its development costs either by purchasing insurance or having the foresight to draft more favorable terms in the contract, which, it must be empha sized, had been extended three times stretching back to November 1997. The judge further inferred from Ocean Atlantic's historical relationship with the Sellers and the language of the contract itself--a contract which wasnegotiated by experienced commercial attorneys--that Ocean Atlantic assumed the risk of forfeiting title to the property if it failed to complete the necessary documents prior to the deadline. These findings are not unreasonable. Anderson, 470 U.S. at 574.

Moreover, although Ocean Atlantic blames its investment partner (Black Acre) and its lender of choice (Yorkville National Bank) for its failure to comply with the drop-dead clause, it appears to us that the problem more likely was caused by Ocean Atlantic waiting until the eleventh hour to execute and revise all the requisite documents. "When parties wait until the last minute to comply with a deadline, they are playing with fire." Spears, 74 F.3d at 157. The bank forwarded every initial loan document to Ocean Atlantic on January 19, 2001. Ocean Atlantic and Black Acre then exhausted six full days meeting with their attorneys and revising the papers before returning them to the bank along with comments and proposed changes on the

morning of the closing--January 25. The bank reviewed the revised documents over the course of several hours, and it was at this point, in response to the counteroffers made by Ocean Atlantic and Black Acre, that the bank first asked for additional documentation from Black Acre. Ocean Atlantic would have had additional time to respond to the bank's request if it had returned the paperwork to the bank on January 23 or 24, and from our review, we conclude that it had ample opportunity to do so. Ocean Atlantic asserts that its entire legal staff needed the full six days to revamp the documents but ignores the fact that it played the waiting game for more than three years and then agreed to the very deadline it is now attacking. Furthermore, as the magistrate judge noted, Ocean Atlantic wasted at least some time and energy contacting the Sellers in a last-ditch attempt to renegotiate terms of the settlement agreement itself./8 If Ocean Atlantic had truly focused all of its legal resources on completing the deal, instead of trying to rewrite it, then perhaps we would not be here today. We therefore reject Ocean Atlantic's anemic attempt to find a scapegoat for its own lack of diligence.

We are convinced that Ocean Atlantic failed to use reasonable efforts to complete the deal by the material date required in the contract. We agree with the district court that it would have been improper to deprive the Sellers of the benefit of the drop-dead provision merely because of Ocean Atlantic's difficulties with its lender of choice. Cf. Chariot Holdings, 153 Ill.App.3d at 54, 60. The magistrate judge stated as follows:

Although Ocean Atlantic argues that it would suffer "unconscionable prejudice," the [c]ourt is not persuaded by that argument. Ocean Atlantic is a sophisticated and experienced land development company, which has been represented by counsel since the beginning of this controversy in 1997. Ocean Atlantic made this same "prejudicial" argument in its 1998 lawsuit against Plaintiffs for specific performance (a lawsuit that it eventually voluntarily dismissed). Indeed, paragraph 20 of Ocean Atlantic's Complaint for Specific Performance in that case

references its "extensive expenditure of time, effort and money to prepare the Property for development." It is now 2001, and Ocean Atlantic is, essentially, making the same argument. If Ocean Atlantic did not want to lose its investment, then it either should not have agreed to paragraph 15 of the Settlement Agreement, or it should have complied with paragraph 15 of the Settlement Agreement (or at least selected a closing date that was not one day before the final, "drop-dead" closing date).

132 F. Supp.2d at 673-74. The magistrate's findings are amply supported by the evidence; thus, we refuse to hold that it is unfair for Ocean Atlantic to forfeit all rights to the property, while the Sellers retain the same property and all improvements thereto. See Hemenway v. Peabody Coal Co., 159 F.3d 255 (7th Cir. 1998) (discussing tenets of risk allocation); Maywood Proviso, 252 Ill.App.3d at 170 (courts sitting in equity are not required to "revise a contract and give a litigant a better bargain than he himself made").

As a final point, we reject Ocean Atlantic's assertion that the Sellers should be equitably estopped from walking away from the contract. Ocean Atlantic claims that the Sellers have "unclean hands" because they presently wish topursue a better deal with another developer, who is willing to pay a premium for the land now that it has been improved. (Reply at 5-6.) Ocean Atlantic's argument reflects a deep misunderstanding of accepted business practices and is without merit, for we are convinced that the Sellers have acted in good faith while performing their contractual obligations. The Sellers were entitled to insist on strict adherence to the deadline, which was first set for November 15, 1997 and had been generously extended three times. The deadline was a material provision of the contract, rather than a boilerplate, technical term seized upon as an afterthought in an attempt to reap a windfall at Ocean Atlantic's expense. Because the Sellers had the legal right to terminate the agreement, it is legally irrelevant whether they were also motivated by reasons which would not themselves constitute valid grounds for termination.

Refinement Int'l Co. v. Eastbourne N.V., 815 F. Supp. 738, 742 (S.D.N.Y. 1993), aff'd, 25 F.3d 105 (2d Cir. 1994). Cf. Commonwealth Petro. Co. v. Billings, 759 P.2d 736, 740 (Colo. Ct. App. 1988) (refusing to find material breach when "the objection raised was a mere 'afterthought' used improperly to 'bootstrap' a technical defect into a meritless claim for rescission"); T. Ferguson Constr. v. Sealaska Corp., 820 P.2d 1058, 1063-64 (Alaska 1991) (Matthews, J., dissenting).

We perceive no clear error with the district court's ruling that Ocean Atlantic's failure to meet the January 25, 2001 closing deadline--after the closing deadline was extended on three occasions, the Sellers declared that no further delays would be tolerated, the Buyers filed and dismissed a suit for specific performance, the Sellers filed and dismissed a suit for declaratory judgment, and both parties entered into a settlement agreement granting Ocean Atlantic one final chance to purchase the property--was a material breach. Therefore, the Sellers were entitled to terminate the contract. To the extent that enforcement of the deadline results in a forfeiture, we hold that the court's decision to effectuate the forfeiture clause was proper. First Nat'l Bank & Trust Co. of Evanston v. First Nat'l Bank of Skokie, 178 Ill. App.3d 180 (1st Dist. 1988).

B.  Attorney's Fees

The final matter before us is the Sellers' request for an award of attorney's fees and costs in pursuing this appeal. (Br. at 44.) Paragraph 17 of the settlement agreement provides: "In any action brought to enforce this Settlement Agreement, the prevailing party shall be entitled to reimbursement from the losing party for all reasonable attorney's fees and costs associated with that legal action." This provision is enforceable despite Ocean Atlantic's material breach, and so pursuant to the settlement agreement, the Sellers are entitled to their fees and costs arising out of this civil action. Rissman v. Rissman, 229 F.3d 586 (7th Cir. 2000). Within twenty days, the Sellers shall present us with an itemized list of all the expenses they incurred by defending

against this appeal. The Sellers also may apply directly to the district court, which has retained jurisdiction over this matter, if they wish to recover their fees and costs below. Id. at 589.

V.  CONCLUSION

"Never put off until tomorrow what you can do today."/9

   Although contract law allows parties to choose the reasonable extent of their duties and obligations towards one another, neither law nor equity guarantees that a party may specifically enforce a contract if it fails to perform its material obligations thereunder. A reasonable factfinder concluded that Ocean Atlantic treated the material, bargained-for deadlines in this agreement as if they were trivial details that could be flouted with impunity. As a result, Ocean Atlantic has lost any and all rights to purchase the Sellers' farmland. The judgment of the district court is AFFIRMED.


FOOTNOTES

/1 Taking our cue from the parties, we alternatively refer to the clause as a "time-essence" clause, a "drop-dead" clause, or "paragraph 15 of the settlement agreement."

/2 Spears v. City of Indianapolis, 74 F.3d 153, 154 (7th Cir. 1996) (quoting Dinah Washington, What a Diff'rence a Day Makes! (Mercury Records 1959)). Id. at 158 (affirming trial court's decision to deny motion for one-day extension in filing evidentiary materials, strike untimely-filed materials, and grant summary judgment on basis of properly filed record).

/3 Argoudelis' direct examination contains the following testimony concerning Ocean Atlantic's conduct:

Q: Did Mr. Ferraguto, in November of 1999, ever make a threat about litigation and how long he could tie you up in litigation?

A: Yes. At the October 1999 meeting at my office . . . they had told us that there is a moratorium, that we're going to need more time to close, and this could take another two years, and a lot of this and that. And I told him, "Either you close by November 30, 1999, or we will terminate the contract. There will be no other options."

And I was very clear about that, because we were very upset with the new delay they were coming up with. And he responded, "Well, that would be stupid, because we'll tie you up in litigation for years."

/4 Sahadi holds that the factfinder should also consider whether the provision is considered material in light of relevant extrinsic evidence such as: the parties' negotiations over the contract, their course of performance, their prior course of dealing, and the usage of trade in the relevant industry. Such evidence is relevant primarily to an understanding of the parties' intent, rather than the effect of the breach ex post. Therefore, it must be considered at the first stage of the materiality inquiry, as we explain more fully in Part IV.A.1 of this opinion.

/5 The magistrate judge stated at one point that he was considering the "prior dealings of the parties," 132 F. Supp.2d at 673, but it is apparent that he was relying, in fact, upon the statements and actions of the parties during their negotiating sessions and their course of performance prior to January 26, 2001. Id. at 665-67. A prior-course-of-dealings analysis is based on the assumption that the parties intend to repeat their established pattern of behavior in future situations. See, e.g., Capitol Converting Equip. v. LEP Transp., 965 F.2d 391 (7th Cir. 1992); 5 Corbin on Contracts sec. 24.17 (2000). In this case, because the plaintiffs extended the closing dates on each prior occasion, we cannot agree that the parties' prior dealings showed "that a final 'drop-dead' closing date was the most essential priority for Plaintiffs." 132 F. Supp.2d at 673. However, as explained in this section and ante at 7-10, the parties' intent to adhere strictly to the January 25, 2001 drop-dead date was made perfectly clear by the statements and actions of the parties during their negotiating sessions and their course of performance prior to January 26, 2001. Thus, it is unnecessary to remand for further factfinding. See Bishop v. Gainer, 272 F.3d 1009, 1019 (7th Cir. 2001); United States v. One Bell Jet Ranger II Helicopter, 943 F.2d 1121, 1127 (9th Cir. 1991).

/6 Any doubts about the importance of the drop-dead clause are dispelled by Argoudelis's testimony, which the trial judge found to be "entirely credible." Argoudelis stated, in pertinent part, as follows:

Q: In your mind, was there any single, non-negotiable term that had to be part of any settlement?

A: First, we were not inclined to settle at all, but if we were going to settle, it had to be one closing and it had to be a date that could not be violated. Either they closed or they completely had no rights whatsoever to the property thereafter.

.  .  .  .

Q: Mr. Argoudelis, would you have entered into this settlement agreement if the terms of Paragraph 15 were not included in the contract?
A: Never. . . . Because the whole idea, and that all ties into, perhaps, Paragraph 15, that we wanted finality. We wanted a date whereby our relationship with Ocean Atlantic would end, one way or the other.

.  .  .  .

Q: Now, why didn't you accept the money [on January 26, 2001]?

A: Because the contract had terminated prior to that time.

Q: Are you suggesting that you felt like you didn't have the right to take the money on January 26?

A: . . . I don't know what our rights were after that date. I know our contract was terminated, and that was our agreement, and we intended to live by the settlement agreement. Either the contract terminates or the closing occurred prior to January 25. When the closing didn't occur prior to January 25th, the contract was terminated, and our relationship with Ocean Atlantic was severed, one way or another, as we had always intended, pursuant to the settlement agreement.

/7 In so holding, we necessarily reject Ocean Atlantic's related argument that the trial judge should have given any weight--much less significant weight--to the testimony of Ocean Atlantic President Michael Ferraguto, who stated that it is unusual for time-essence clauses to be strictly enforced in complex real estate transactions like the one before us. (Br. at 28.) Even assuming that parties customarily disregard delays in performance involving several days or less, nothing in this record indicates that the Sellers relied upon such a custom or practice when they negotiated this particular drop-dead clause. Thus, the judge properly concluded that Ocean Atlantic's evidence on this point was irrelevant. Hart, 106 Ill.App.3d at 807.

/8 Between January 19 and January 24, Ocean Atlantic sent the Sellers several letters stating that the

Sellers were obligated to pay an additional $680,000 in annexation fees. This demand had never been raised at any prior point in the parties' 3-year history and obviously was either a gimmick or a bad faith attempt to extort nearly 10 percent of the contract's purchase price on the eve of closing. 132 F. Supp.2d at 668 n.12. Argoudelis states that Ocean Atlantic abandoned its claim only after, "in very harsh language," he "told them that they better get themselves to the closing on the 24th because we would be there and we would close pursuant to the terms of the settlement agreement and they'd better do likewise."

/9 Popular Sayings and Proverbs 246 (Gregory Y. Titelman, ed. 1996).