UNPUBLISHED ORDER
Not to be cited per Circuit Rule 53

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued September 13, 2005
Decided May 9, 2006

**Before**

Hon. RICHARD A. POSNER, *Circuit Judge*

Hon. KENNETH F. RIPPLE, *Circuit Judge*

Hon. DIANE P. WOOD, *Circuit Judge*

| | |
|---|---|
| Nos. 05-1234, 05-1330 | Appeals from the United States District Court for the Northern District of Illinois, Eastern Division. |
| ALL EMS, INCORPORATED, an Illinois corporation, MAGDY WAGDY and SUSAN WAGDY, | |
|     *Plaintiffs-Counter-Defendants-Appellants,* | No. 96 C 6235 |
|     *v.* | **Wayne R. Andersen**, *Judge.* |
| 7-ELEVEN, INCORPORATED, a foreign corporation, doing business as 7-ELEVEN FOOD STORES, | |
|     *Defendant-Counter-Plaintiff-Appellee.* | |

## ORDER

This diversity action arises out of the troubled relationship between the 7-Eleven Corporation ("7-Eleven") and one of its franchisees, All EMS, Incorporated ("All EMS"), whose co-owners operate a 7-Eleven store in Chicago, Illinois. The parties have been litigating their difficulties since 1996, each claiming that the

other, at various points, has breached the agreement that governs their franchise relationship.  The first trial in June 2000 resulted in a hung jury.  The case then was retried before the district court as a bench trial, and in an order dated January 3, 2005, the district court awarded 7-Eleven possession of the store and $2,731.54 in damages.  All EMS has appealed, contending that the bench trial impaired its rights to due process and a jury and that the district court calculated damages improperly.  For the reasons set forth in the following order, we affirm the judgment of the district court with a slight modification of the damages awarded to 7-Eleven.

# I

# BACKGROUND

Initially, we recount a basic synopsis of the facts found by the district court, which are not to be "set aside unless clearly erroneous."  Fed. R. Civ. P. 52(a); *Cerros v. Steel Techs., Inc.*, 288 F.3d 1040, 1044 (7th Cir. 2002).  As we proceed to discuss the parties' arguments on appeal, we shall describe additional facts and procedural details when necessary.

## A.  Facts

On April 14, 1987, 7-Eleven entered into a store franchise agreement with Magdy and Susan Wagdy (collectively, the "Wagdys"), the sole owners of All EMS, which was assigned the Wagdys' rights and obligations under the agreement.  By the terms of the agreement, 7-Eleven provided All EMS with a lease of the store, use of the 7-Eleven license and trademark, and consulting support services to assist the Wagdys' in accounting, payroll and day-to-day store operations.  7-Eleven also provided All EMS with short-term financing to cover its operating expenses.

As part of the Wagdys' obligations under the franchise agreement, they were required to maintain a minimum balance of $10,000 in an account entitled "Net Worth."  Net worth represented the franchisee's equity stake in the business at any given time and was meant to assure full repayment of 7-Eleven's short-term financing loans in the event of franchisee default.  The net worth balance was calculated by subtracting from the franchisee's total assets any amounts owed to 7-Eleven under the ongoing financing arrangement.

The franchise agreement further provided that failure to maintain the minimum level of net worth constituted a "Material Breach" that gave 7-Eleven

good cause to terminate the franchise.  R.329-1, Ex.1 at 11.  Should the Wagdys' net worth balance fall below the required amount, 7-Eleven would send them a written notice indicating that they were in breach of the agreement.  Upon receiving a notice of breach, the agreement gave All EMS a four-day window in which to cure the breach by restoring the Wagdys' net worth balance to the contractual minimum.  However, the agreement denied All EMS the right to cure if it already had committed two material breaches within the previous three years.

The primary events at issue in this appeal began on January 24, 2000, when 7-Eleven sent All EMS a notice of breach alerting it that its net worth balance had fallen below $10,000.  The shortfall, as acknowledged by the notice, was due partly to a charge that 7-Eleven previously had made against the Wagdys' net worth account.  Recognizing that the Wagdys disputed this charge, the notice recited that, even apart from any disputed amount, All EMS still needed to remit $14,210 to cure its breach.  On January 27, 2000, All EMS paid 7-Eleven $14,210.  However, on January 31, 2000, 7-Eleven mailed All EMS a second notice of breach indicating that the previous notice stated an incorrect deficit.  The $14,210 amount demanded by the previous notice and paid by the Wagdys brought their net worth to $0, not to the $10,000 required under the franchise agreement.  Consequently, the January 31, 2000 letter demanded an additional payment of $10,000.  Under the agreement's cure provisions, All EMS had until February 4, 2000 to remit the $10,000.  On February 3, 2000, All EMS made a payment of $301.  All EMS' next payment did not come until February 21, 2000, when it submitted $2,730.

Over the next 21 months, All EMS' net worth shortage continued to grow.  7-Eleven repeatedly sent out notices of breach that declared the franchise agreement terminated and asserted 7-Eleven's right to repossess the Wagdys' store.  Nevertheless, the Wagdys refused to surrender possession of the store or to settle their net worth balance.  They claimed that 7-Eleven had failed to fulfill basic obligations under the franchise agreement and thereby had prevented the Wagdys from earning the revenue needed to meet their net worth obligations.  7-Eleven's breaches allegedly included:  (1) failing to replace freezers in the store, thereby depriving All EMS of frozen food revenue; (2) failing to replace phone card and money order machines; (3) failing to notify All EMS of upcoming cigarette promotions; (4) charging All EMS' equity account for maintenance that was not performed; and (5) failing to provide All EMS with the consultation services of 7-Eleven Field Representatives, who work with individual stores to maximize profits.

## B.  District Court Proceedings

Although the events just recited took place in early 2000, litigation between All EMS and 7-Eleven actually commenced in 1996 with the filing of All EMS' first complaint in state court. The complaint arose out of a September 23, 1996 notice of termination that 7-Eleven had sent to All EMS because the Wagdys allegedly had been underreporting retail prices.[1] The case was removed to the United States District Court for the Northern District of Illinois and proceeded to a jury trial in 2000. The jury could not reach a verdict, and the court declared a mistrial. The case then was retried as a bench trial.

At the time the bench trial commenced, All EMS had filed its Fourth Amended Complaint, which alleged the following seven counts: (1) breach of the implied covenants of good faith and fair dealing; (2) violation of the Illinois Franchise Disclosure Act; (3) breach of contract; (4) & (5) common law fraud; (6) intentional spoliation of evidence; and (7) negligent spoliation of evidence. These counts related to the events beginning with the January 25, 2000 notice of breach. For its part, 7-Eleven had filed a counterclaim alleging breach of the franchise agreement and seeking repossession of the store. However, because 7-Eleven's pleading did not mention the 1996 events, All EMS also filed a counterclaim of its own, setting forth all of its existing claims against 7-Eleven, including those remaining from the 1996 dispute.

The district court found for 7-Eleven on all counts, awarding 7-Eleven repossession of the store as sought in its counterclaim. Determining that All EMS had breached materially the franchise agreement's net worth requirements, the court held that 7-Eleven also was entitled to monetary damages. In calculating 7-Eleven's relief, the court began with an initial figure of negative $55,422, which represented the Wagdys' net worth balance according to a March 13, 2002 notice of termination. The court then analyzed "whether the reduction in Net Worth [was] justified due to 7-Eleven's misconduct." R.311 at 7. The court found that 7-Eleven's failure to replace or maintain the freezers resulted in $37,091 in lost sales and

---

[1] Under the franchise agreement, 7-Eleven was entitled to a 52% share in net revenue earned by the Wagdys' store. According to a 1996 notice of termination sent by 7-Eleven, the Wagdys had been reporting retail prices to 7-Eleven that were lower than those actually charged to customers, thereby depriving 7-Eleven of 52% of the difference between the two prices. The notice reported that All EMS' net worth account had been credited with the amount 7-Eleven believed it should have received absent the misreporting. After adjustment, All EMS' net worth had fallen below the contractually-required minimum, and, as a result, All EMS was in breach of the franchise agreement and risked losing possession of its store. All EMS objected and sued to halt repossession of the store.

inventory. It further concluded that All EMS had been damaged in the amount of $15,600 by 7-Eleven's failure to provide field representative support. The court reduced 7-Eleven's damages by these amounts and arrived at a damage total of $2,731.

The district court then "resolve[d] with finality all issues pending before the Court" as a result of the "numerous pleadings and amended pleadings in this long and drawn out litigation." *Id.* at 9. The court ruled in favor of 7-Eleven on all of the remaining counts contained in All EMS' Fourth Amended Complaint and Second Amended Counterclaim.

## II

## DISCUSSION

### A. Standard of Review

On appeal from a decision rendered in a bench trial, we review for clear error the district court's resolution of factual questions, *see* Fed. R. Civ. P. 52(a), such as which party breached the franchise agreement and when that breach occurred. *See, e.g., Elda Arnhold & Byzantio, L.L.C. v. Ocean Atl. Woodland Corp.*, 284 F.3d 693, 709 (7th Cir. 2002).

### B. Breach of the Franchise Agreement

As it did at the bench trial, All EMS seeks to avoid liability for breach of the franchise agreement's net worth provisions by asserting that 7-Eleven induced the breach when it failed to fulfil its own obligations under the contract. Although the district court decided the issue of contractual liability in 7-Eleven's favor, All EMS now maintains that the district court, by reducing 7-Eleven's award, "demonstrate[d] that the conduct of 7-Eleven prevented or frustrated the Wagdy's [sic] ability to fully perform under the Store Franchise Agreement." Appellants' Br. at 28. This misconduct, according to the district court, included 7-Eleven's failure to fix the Wagdys' freezers and provide them with adequate consulting support. In addition, All EMS cites instances in which 7-Eleven deprived the Wagdys of the opportunity to participate in revenue-generating cigarette promotions and made improper charges against the Wagdys' net worth account. All EMS claims that these additional instances of misconduct on the part of 7-Eleven were overlooked by the district court, further prevented the Wagdys from meeting their net worth

obligations and should excuse their breach.  We shall address these contentions after setting forth the basic legal framework.

Under Illinois law, "[a] party that fails to perform its contractual duties is liable for breach of contract, and a material breach of the terms of the contract will serve to excuse the other party from its duty of counterperformance." *Elda Arnhold & Byzantio, L.L.C.*, 284 F.3d at 700 (collecting Illinois authority).  A breaching party will not be liable, however, when the other party to the contract unjustifiably caused the breach by preventing the breaching party from performing.[2]  A party is said to have prevented performance when it refuses to comply with its own obligations under the agreement, and the party accused of breach can show that it would have rendered performance absent the hindering party's misconduct.  *See* Restatement (Second) of Contracts § 245, comments a & b.

In seeking relief from liability under this doctrine, All EMS first contends that the district court should have considered an assortment of "disputed charges" imposed by 7-Eleven that decreased the Wagdys' net worth by a total of $8,263.  Appellants' Br. at 36.  By wrongfully imposing these charges, All EMS submits, 7-Eleven contributed to the decline in the Wagdys' net worth and induced their material breach.  As far as we can tell, the most significant of these charges, and the only one addressed by All EMS in any detail, is a $6,167 "Inventory Variation charge" assessed in January 1999.  *See id.*  Concerning this charge, All EMS maintains that evidence of an "audit adjustment" occurring in December 1998 demonstrates that the charge was booked improperly against All EMS' net worth account.  We fail to see, however, why evidence of an "audit adjustment" would supply proof that the improper charge stayed on the books.  As All EMS explains it, the audit would appear to have corrected such a charge.  Moreover, as All EMS concedes, 7-Eleven offered testimony that this inventory variation was handled properly by its accountants.  In hearing this testimony and reviewing what appears to be a proper adjustment, the district court's refusal to accept All EMS' contention was not clear error.

---

[2] This rule has deep roots in the common law and has been reaffirmed by Illinois courts and federal courts applying Illinois law.  *See United States v. Peck*, 102 U.S. 64, 65 (1880) ("[H]e who prevents a thing being done shall not avail himself of the non-performance he has occasioned."); *Cenco Inc. v. Seidman & Seidman,* 686 F.2d 449, 453 (7th Cir. 1982) ("A breach of contract is excused if the promisee's hindrance or failure to cooperate prevented the promisor from performing the contract."); *Pfaff v. Petrie*, 71 N.E.2d 345, 351 (Ill. 1947) ("[D]elays and non-performance may be . . . excused where prevented by the other party to the contract.").

All EMS contends next that 7-Eleven contributed to the decline in the Wagdys' net worth by denying Mr. Wagdy the display pieces necessary to participate in lucrative cigarette promotions. In addressing this contention, the district court relied upon what it deemed credible testimony from Bernard Schmidt, a 7-Eleven field representative, that Mr. Wagdy already had the shelving necessary to participate in the cigarette promotions. All EMS now submits that Schmidt "had a problem recalling things" on the stand, Appellants' Br. at 39, and therefore that his testimony should not have been credited. This argument does not present a sound basis for overturning the district court's credibility determination on appeal. The district court heard Schmidt testify and did not think that his testimony should be discounted because of his problems recalling the events. Such a credibility determination "can virtually never amount to clear error," *Lac Du Flambeau v. Stop Treaty Abuse-Wisconsin, Inc.*, 41 F.3d 1190, 1194 (7th Cir. 1994), and it did not in this instance.

Of course, the district court did find that 7-Eleven's failure to repair the Wagdys' freezers and provide adequate consulting support impeded All EMS' ability to earn revenue and remedy its net worth balance. The court penalized 7-Eleven for its misconduct by reducing the award of damages. All EMS now submits that 7-Eleven's misconduct also should relieve the Wagdys of contractual liability. However, even according to All EMS' chronology, 7-Eleven's misconduct cannot excuse the Wagdys' breach. On January 31, 2000, All EMS' net worth account reflected a balance of $0, meaning that All EMS was $10,000 short of the contractual minimum. Thus, as of this date, All EMS was in material breach of the franchise agreement and had until February 4, 2000 to cure the breach by paying 7-Eleven $10,000. All EMS paid only $301 before the February 4, 2000 deadline. It made no additional payment until February 21, 2000, and even that payment, $2,730, failed to remedy the net worth deficit. Failure to cure the January 31, 2000 shortfall placed All EMS squarely in breach of the agreement as of February 4, 2000. The February 4 date is crucial--and ultimately fatal to All EMS' position--because conduct attributed to 7-Eleven that caused the decline in All EMS' net worth began at the earliest on March 23, 2000, well after All EMS already had breached the agreement.

For instance, All EMS' brief cites "Spring of 2000" as the first time 7-Eleven had notice of problems concerning the freezer equipment in the store. Appellants' Br. at 12. More specifically, All EMS describes a visit on March 23, 2000 from 7-Eleven Field Consultant Bernard Schmidt, in which he observed the freezer problems and reported them to a 7-Eleven market manager. All EMS points out that, despite this visit, the freezer problems went unrepaired. Yet, even assuming 7-Eleven's failure to fix the freezers hindered All EMS' performance, this neglect did not begin for more than a month after All EMS had let its net worth deficit go

uncured.  Similarly, the interruption in field consultant support, according to All EMS, began on July 17, 2000, when John Stetzinger replaced Schmidt as the field consultant assigned to All EMS' store.  *See id.* at 13.  This date also is well after the point at which All EMS and the Wagdys were in material breach of the franchise agreement.  The sequence of events establishes, therefore, that All EMS materially breached the agreement and surrendered its rights to the franchise before any conduct by 7-Eleven would have justified that breach.

Of course, as the district court concluded, part of the subsequent decline in the Wagdys' net worth may have been exacerbated by 7-Eleven's own actions. Ordinarily, when one party to a contract is in material breach, the non-breaching party is excused from performance.  *See, e.g., Eager v. Berke*, 142 N.E.2d 36 (Ill. 1957).  However, when the non-breaching party was partially to blame for the harm that it suffered, there are two doctrines in contract law that allow a court to reduce the damages awarded to that party.[3]  The first is the obligation imposed on the non-breaching party to mitigate damages.  *See Maier v. Lucent Techs., Inc.*, 120 F.3d 730, 738 (7th Cir. 1997) (discussing the duty to mitigate under Illinois contract law).  In the present case, All EMS breached the franchise agreement first, but 7-Eleven failed to ease, or "mitigate," the effect of this breach by refusing All EMS the services that it needed to maximize net worth for the remainder of the parties' relationship.  Therefore, the district court was justified in reducing 7-Eleven's damages by the degree to which it failed to mitigate.

The second doctrine supporting a reduction in 7-Eleven's damages is known most commonly as "partial breach."  *See Israel v. Nat'l Canada Corp.,* 658 N.E.2d 1184, 1190 (Ill. App. Ct. 1995) (citing Corbin on Contracts § 946 at 926).  Under this doctrine, a non-breaching party who fails to terminate the contractual relationship upon the other party's material breach will be said to treat that breach as "partial" instead of as material.[4]  In such a case, the non-breaching party may sue for

---

[3]  The district court, in analyzing "whether the reduction in Net Worth [was] justified due to 7-Eleven's misconduct," R.311 at 7, failed to specify which of these doctrinal approaches it followed.  Nevertheless, we may affirm the ultimate conclusion on any basis fairly supported by the record.  *See Cygan v. Wisconsin Dep't Corr.*, 388 F.3d 1092, 1098 (7th Cir. 2004).

[4]  An explanation of this approach can be found in *Farnsworth on Contracts* § 8.15 (2d. Ed. 2001):

If the injured party does not terminate the contract, either because that party
(continued...)

damages, but must continue performing its own obligations under the contract. *Id.* ("[A] partial breach by one party does not justify the other party's subsequent failure to perform." (internal quotation marks omitted)). Applying this doctrine to the record before us, we see that 7-Eleven, although justified at various points to terminate the contract, did not. It therefore was obligated, until it did terminate the agreement, to continue performing its end of the bargain. To the extent that it did not and therefore was responsible for the post-breach decline in All EMS' net worth, the district court was correct in offsetting 7-Eleven's damages accordingly. We therefore see no reason to upset the district court's formula for apportioning damages.

## C. All EMS' Right to Due Process and a Jury Trial

Although its contentions concerning contractual liability lack merit, All EMS has urged two alternative positions with a view to keeping its claims alive. It asserts that the bench trial in which the district court resolved all remaining issues raised by All EMS' then-extant pleadings deprived All EMS of its Seventh Amendment right to a jury trial on those residual issues. All EMS also submits that its right to due process was violated when the district court decided these issues without hearing evidence on them. We shall address each contention in turn.

### 1. All EMS' Right to a Jury

As we previously described, the district court attempted to put an end to the protracted litigation between these parties that had been ongoing for almost ten

---

(...continued)

> has no right to or does not choose to, the injured party is said to treat the breach as partial. The injured party has a claim for damages for partial breach, in addition to its remaining substantive rights under the contract. Damages are calculated on the assumption that both parties will continue to perform in spite of the breach. They therefore compensate the injured party only for the loss it suffered as the result of the delay or other defect in performance that constituted the breach . . . .

(footnotes omitted); *see also Dr. Franklin Perkins Sch. v. Freeman*, 741 F.2d 1503, 1518-19 (7th Cir. 1984) (holding that a non-material breach allows the non-breaching party to sue for damages, but does not relieve the non-breaching party of its obligations under the contract); *see also* Restatement (Second) of Contracts §§ 237, 241(a).

years. As part of the court's January 5, 2005 order, entered at the conclusion of the bench trial, the court disposed of all counts pending in All EMS' Fourth Amended Complaint and Second Amended Counterclaim. All EMS contends that this was constitutional error because the bench trial was a "bifurcated" proceeding meant to decide solely the issues related to All EMS' 2000 net worth deficit. According to All EMS, the parties intended to proceed, at the conclusion of the bench trial, to a trial before a jury on All EMS' remaining grievances, including those related to the older, 1996 dispute. The record, interestingly, is devoid of any reference to bifurcation, and neither the district court nor the parties ever referred to the bench trial as a bifurcated proceeding until All EMS' motion for a new trial. *See* R.313 at 1. The bench trial, nonetheless, did seem focused on deciding 7-Eleven's Third Amended Counterclaim, which alleged breach of the franchise agreement based on events occurring in 2000, and sought damages and repossession of the Wagdys' store. *See* R.279.

Assuming, *arguendo,* that All EMS is correct in characterizing the bench trial as a bifurcated proceeding, Federal Rule of Civil Procedure 42(b) governs the parties' claims. Rule 42(b) gives a district court the power "in furtherance of convenience or . . . when separate trials will be conducive to expedition and economy, . . . [to] order a separate trial . . . of any separate issue or issues." Using bifurcation in order to conduct "an evidentiary hearing limited to a discrete, potentially dispositive issue is an authorized and frequently a sensible method for expediting the decision of cases." *Robinson v. Sheriff of Cook County*, 167 F.3d 1155, 1157 (7th Cir. 1999). The rule qualifies this power by providing that a procedural device such as bifurcation may not be used in a manner that impinges upon the constitutional right to a jury trial guaranteed by the Seventh Amendment. Fed. R. Civ. P. 42(b).

Importantly, however, "[t]he right [to a jury trial] disappears if all parties entrust the resolution of factual issues to the court without objection." *Stewart v. RCA Corp.*, 790 F.2d 624, 630 (7th Cir. 1986). "This circuit is in the majority of circuits that hold that failure to object to a non-jury factfinding proceeding waives a valid jury demand as to any claims decided in that proceeding, at least where it was clear that the court intended to make fact determinations." *Lovelace v. Dall*, 820 F.2d 223, 227 (7th Cir. 1987).[5]

---

[5] The precise language of Rule 39(a), which governs the availability of bench trials, provides: "The trial of all issues so demanded shall be by jury unless (1) the parties or their attorneys of record, by written stipulation filed with the court or by an oral stipulation made in open court and entered in the record, consent to trial by the

(continued...)

All EMS concedes that it agreed to a bench trial that would resolve "issues regarding Net Worth being asserted by 7-Eleven." Appellants' Br. at 41. All EMS also concedes that "[t]he allegations set forth in the Wagdy's [sic] Fourth Amended Complaint are intricately intertwined with 7-Eleven's allegations concerning Net Worth." Appellants' Reply Br. at 23. At the very least, therefore, All EMS proceeded willingly to a bifurcated proceeding on allegations that very likely would be resolved, as a matter of law, once the net worth issues were decided. Having consented to a bench trial where "it was clear that the court intended to make fact determinations" whose unfavorable resolution would end this litigation, All EMS and the Wagdys waived their right to a jury. *Lovelace*, 820 F.2d at 227.

### 2. All EMS' Due Process Rights

All EMS further contends that the district court's decision, at the conclusion of the bifurcated bench trial, to "resolve with finality all issues pending before the Court," R.311 at 9, deprived it of due process of law. We note, as a preliminary matter, that the district court's original decision to bifurcate was interlocutory, and a trial court has discretion to revise or set aside its interlocutory orders before the entry of final judgment. *See* Fed. R. Civ. P. 54(b); *Partmar Corp. v. Paramount Pictures Theatres Corp.*, 347 U.S. 89, 100 (1954); *O'Malley v. United States Fid. & Guar. Co.*, 776 F.2d 494, 500-01 (5th Cir. 1985). We therefore are confined to determining whether, under the circumstances here, the bifurcated proceeding deprived the Wagdys of their constitutional entitlement to due process.

In *Partmar*, the Supreme Court considered whether due process was violated when a district court dismissed a party's claims in a bifurcated proceeding without conducting a separate trial as to their merits. In that case, Partmar and Paramount entered into a franchise agreement in which Partmar agreed to exhibit Paramount's first-run films at a cinema leased from Paramount. Subsequently, a decree was entered in an antitrust suit initiated by the United States against Paramount, which enjoined Paramount from performing under existing franchise agreements and from entering into future franchise agreements. Paramount relied on the antitrust decree as cause for terminating Partmar's franchise and lease

---

[5](...continued)
court sitting without a jury . . . ." Fed. R. Civ. P. 39(a). The language of Rule 39 "has been interpreted broadly so as to encompass orders entered by the court and not objected to; statements by the judge on the record that are not objected to; and briefs arguing that the judge can decide certain matters as a legal question." *Lovelace v. Dall*, 820 F.2d 223, 227 (7th Cir. 1987).

agreements. *See Partmar Corp.*, 347 U.S. at 93. When Partmar refused to vacate the leased premises, Paramount sued Partmar for unlawful detainer and for a declaratory judgment. Partmar subsequently filed a counterclaim against Paramount seeking treble damages for alleged antitrust violations. Partmar's counterclaim asserted that the franchise and lease agreements had "excessive terms and conditions" as a result of an unlawful conspiracy between Paramount and others. *Id.* at 93-94. The district court ordered separate trials for Paramount's claims and Partmar's counterclaims. Before trial, however, the United States Supreme Court overturned a portion of the antitrust decree, holding that Paramount's franchise agreements were not per se unlawful. Following the trial on Paramount's claims, the district court found that the franchise and lease agreements were not illegal, so Paramount had no basis for terminating them. The district court, therefore, dismissed Partmar's counterclaims without proceeding to the second trial. On appeal, Partmar did not challenge the district court's findings pertaining to Paramount's claims, but challenged instead the dismissal of its counterclaims without the benefit of trial. The Supreme Court affirmed the dismissal, concluding that the district court's finding of no conspiracy "determined the key ingredient of Partmar's counterclaims . . . and thus precluded recovery upon such claims." *Id.* at 101. The bifurcated proceeding comported with due process because Partmar "had ample opportunity upon trial to present evidence and to contest the conspiracy finding." *Id.*

In a similar situation, the Second Circuit heard an appeal of an action brought by attorneys to recover a $155,000 bonus owed by a client for services rendered under a retainer agreement. *See Knapp v. McFarland*, 457 F.2d 881 (2d Cir. 1972). At the outset of that action, the district court directed that the trial of issues pertaining to the $155,000 bonus agreement be bifurcated: the court would determine first whether such an agreement was made, and if an agreement was found, then a jury would hear evidence at a deferred proceeding as to whether the bonus was conscionable. During the bench trial, the court refused to hear certain expert evidence on the conscionability issue, noting that the trial on that issue had been deferred. Much of the other evidence that was introduced related to the making of the agreement, but was relevant also to the issue of conscionability. As a result, the district court resolved the parties' entire dispute at the conclusion of the bench trial, finding "on the basis of the evidence already introduced that the bonus contract was 'a fair and reasonable compensation agreement.'" *Id.* at 887. The Second Circuit reversed and remanded to the district court, directing it to afford the parties "a fair opportunity to offer proof with respect to the deferred issue." *Id.* The court of appeals reasoned that, "[a]lthough most of the essential proof as to conscionability may well have been received by the court in connection with other issues and [the client] not only cross-examined others but also testified personally with respect to circumstances bearing on reasonableness, he was not given the

opportunity to introduce expert witnesses, and he may not have fully cross-examined [the attorneys] as to the issue." *Id.* The court then distinguished the case from *Partmar*, in which the only evidence not offered--the *Paramount* case decree--would not have changed the result. In *Knapp*, by contrast, the client's proffered evidence potentially could have altered the district court's determination of whether the attorneys' bonus was fair and reasonable.

The principle to be drawn from *Partmar* and *Knapp* is that a court has discretion not to hold a subsequent trial if undisputed evidence already adduced can resolve the issues reserved for the deferred proceeding. To demonstrate that due process was violated, a party must explain how additional process, in the form of expert testimony or cross-examination, *see, e.g., Knapp*, 457 F.2d at 887, potentially could have altered the bench trial's result. Turning to All EMS' contentions regarding the district court's failure to hear evidence on certain counts, we shall determine whether All EMS has proffered any evidence, not introduced at the bench trial, that would have altered the outcome on those issues. Each of the counts shall be addressed in turn.

### a. violation of the Illinois Franchise Disclosure Act

At the conclusion of the bench trial, the district court decided that, because it already had found All EMS to be in breach of the franchise agreement, the Illinois Franchise Disclosure Act ("IFDA") did not prevent 7-Eleven from terminating the agreement. The IFDA requires a franchisor to show good cause before terminating a franchise. Good cause as it relates to this case means "the failure of the franchisee to comply with any lawful provisions of the franchise or other agreement and to cure such default after being given notice thereof and a reasonable opportunity to cure such default, which in no event need be more than 30 days." 815 ILCS 705/19(b). All EMS undisputedly let its net worth deficit go uncured for more than 30 days. By the plain terms of the IFDA, then, 7-Eleven had the statutory right to terminate the franchise. *See Original Great American Chocolate Chip Cookie Co., Inc. v. River Valley Cookies, Ltd.*, 970 F.2d 273, 279 (7th Cir. 1992). All EMS does not proffer evidence that would change this result. In fact, All EMS' appellate briefing does not even address the IFDA count.

### b. breach of contract

The district court's dismissal of All EMS' breach of contract count merits little discussion. It is fairly obvious that, in concluding that All EMS breached the agreement's net worth provisions before 7-Eleven did anything to induce that

breach, the district court had to decide, a fortiori, that 7-Eleven did not breach the agreement. The bench trial, even if confined to 7-Eleven's breach of contract claim, gave All EMS adequate opportunity to introduce evidence that 7-Eleven breached first. Due process guarantees, therefore, were not violated.

### c. 1996 dispute over retail price misreporting

At oral argument, counsel for All EMS argued strenuously that the district court, in calculating damages, failed to account for the $11,013 previously deducted from the Wagdys' net worth account due to the 1996 dispute over retail price misreporting. In a June 2000 trial, a jury could not reach a verdict on the misreporting dispute, and the issue lingered as the parties' litigation developed to encompass later instances of material breach. The district court seemed to assume, by the time the bench trial concluded, that the parties had settled their dispute pertaining to the price misreporting. *See* R.311 at 10 ("We note that subsequent to the filing of the Fourth Amended Complaint, 7-Eleven agreed to, and did, credit All EMS and the Wagdys with $11,013.53."). All EMS now contends that this assumption was incorrect and unsupported by evidence. More specifically, All EMS contends that the court's starting point for calculating damages--the $55,422 net worth shortage indicated on the March 13, 2002 Notice of breach--did not take into account the $11,013 still in dispute. All EMS also maintains that the court failed to account for interest that accrued on this amount and was charged against the Wagdys' net worth.

A closer look at the March 13, 2002 notice reveals that 7-Eleven was willing to accept $9,648 less than the Wagdys' actual net worth deficit because it had charged the Wagdys that amount following the 1996 incident. The notice reiterated 7-Eleven's position that it actually was owed $65,422, but stated that 7-Eleven was willing to accept $55,733 ($65,422 - $9,648) in light of the dispute between the parties. Thus, the court's starting point, $55,422, came close to accounting for the 1996 dispute. Unfortunately, it did so by the wrong amount. The parties now do not contest that $11,013 is the actual amount remaining in dispute after the 1996 misreporting incident. For whatever reason, 7-Eleven's notices of breach used the figure $9,648, which the district court then adopted in calculating damages.

Despite the discrepancy, there is no need to remand, as the district court's principle for calculating damages was sound. We agree with its use of the statement of net worth reflected in the March 13, 2002 notice as a starting point, and it was appropriate to adjust this figure by any amount charged against the Wagdys' net worth following the 1996 incident. Everyone agrees at this stage that $11,013, rather than $9,648, was the disputed charge. *See* Appellants' Br. at 34;

Appellee's Br. at 24-25; R.311 at 10. The parties also seem to agree that interest was charged on this amount. *See* Appellants' Br. at 34; Appellee's Br. at 25. Therefore, we shall recalculate damages to account for these oversights. As of the March 13, 2002 notice of breach, the Wagdys' net worth account showed a negative balance of $55,422, meaning they needed to pay 7-Eleven $65,422 to cure their breach. Applying the $11,013 credit to this amount makes the starting point for damages $54,409, instead of the $55,422 amount that the district court used. From that, we subtract $8,536 for the interest assessed, as of March 2002, against the Wagdys' net worth account. *See* Appellants' Separate App., Tab 15. We then subtract, as the district court did, the amounts by which 7-Eleven caused the Wagdys' net worth to decline when it failed fix their freezers or provide them with adequate consulting support ($37,091 and $15,600 respectively). In the end, these subtractions entirely wipe out 7-Eleven's damages, and we therefore modify the district court's damage award by reducing it to zero. We reiterate, however, that All EMS remains liable for breach of contract and must surrender possession of the store. This is because the date for determining contractual liability, as we discussed earlier, is different from the date for assessing damages. As of February 4, 2000--the Wagdys' deadline for curing their net worth deficit--7-Eleven was still in compliance with its obligations under the agreement; it had not yet let the freezers fall into disrepair and still was providing adequate consulting support. It also, as of this date, had assessed only $4,446 worth of interest on the disputed charge. *See* Appellants' Separate App., Tab 15. Therefore, as of the date for determining liability, the Wagdys' net worth still was $5,303 below the $10,000 contractual minimum. They were in breach of the franchise agreement, and our modification of the damage award does not alter that conclusion.

### d. spoliation of evidence

Counts VI and VII of All EMS' complaint asserted that 7-Eleven destroyed records that allegedly were doctored to give the impression that the Wagdys were underreporting retail prices in 1996. The court denied the relief requested in these counts on two grounds: (1) lack of credible evidence that 7-Eleven negligently or intentionally destroyed the records; and (2) lack of prejudice to All EMS because the allegedly destroyed evidence would not have affected the determination of breach. Although the district court found for 7-Eleven without allowing a factual presentation, the court's second, independent ground represented a legal conclusion based on the facts already established at bench trial. This legal conclusion was correct because the allegedly spoliated evidence related to a disputed charge that, as we have mentioned, was reversed for purposes of calculating the Wagdys' net worth balance. The Wagdys would have been in material breach with or without

the information contained in the allegedly spoliated evidence.  Accordingly, the court's resolution of All EMS' spoliation claims comported with due process.

### e.  fraud

Counts IV and V of All EMS' Fourth Amended Complaint sought damages arising from "7-Eleven's fraudulent conversion of the Wagdys' Net Worth" in the amount of $11,013.  Appellants' Br. at 46.  The fraud counts are essentially a restatement of the 1996 misreporting dispute styled as allegations of 7-Eleven's intentional scheme to defraud.  The $11,013 that remained in dispute over the 1996 incident is being taken into account in 7-Eleven's damage award.  This accounting renders All EMS' fraud allegations moot.

### Conclusion

The bench trial did not impinge on All EMS' right to a jury trial or to due process of law.  As discussed, we notice slight oversights in the court's calculation of damages.  Consequently, we reduce 7-Eleven's damages from $2,731 to $0.  We otherwise affirm the judgment of the district court.

AFFIRMED as MODIFIED